32 So.2d 526

**THURLOW et al. v. BERRY et al.**

6 Div. 580.

Supreme Court of Alabama.

Oct. 30, 1947.

598

A. A. Carmichael, Atty. Gen., and Bowers, Dixon & Dunn, Frank M. Dixon, Henry Upson Sims, and Wm. Logan Martin, all of Birmingham, for appellants.

Lange, Simpson, Robinson & Somerville, Jas. A. Simpson, R. L. Lange, Cabaniss & Johnston, Forney Johnston, and Jos. F. Johnston, all of Birmingham, and Phillips Ketchum, of Boston, Mass., for appellees.

BROWN, Justice.

. This appeal is prosecuted by the complainants who filed the original bill from the final decree of the circuit court, sitting in equity, construing the will of Harvey G. Woodward, deceased, who died in Birmingham, Alabama, on the 18th day of November, 1930. .

The decree construes what the parties denominate the "backlog provision," the major bases of the controversy between the parties, as administrative and directory—not mandatory—and subject to the doctrine of approximation, more appropriately the doctrine of equitable deviation; and directs the board of governors to proceed with the construction and maintenance of the first unit of the school provided for in Section (j) of the Tenth Paragraph of said will.

The equity of the original bill filed by Thurlow and Martin, a minority of the Board of Governors, against the other members of the Board, the fiscal trustee First National Bank of Birmingham, and the Massachusetts Institute of Technology, was not questioned on the first appeal nor is it questioned on this appeal.

The bill as last amended sought an interpretation of the will and the advice of the court in respect to the administration of the trust. The only question involved in the former appeal was the sufficiency and equity of the cross-bill filed by the majority members of the Board of Governors, which sought an interpretation of the declaration of trust by the Alabama Educational Foundation, a corporation organized by the testator in his lifetime to which he had conveyed considerable property as an educational foundation for ultimately carrying out the educational scheme outlined in his will.

The equity and sufficiency of the cross-bill was upheld insofar as it sought interpretation of the declaration of trust by the educational foundation as related to the will. And on that appeal this court refused to construe the will in advance of the final decree of the circuit court. Thurlow et al. v. Berry et al., 247 Ala. 631, 25 So.2d 726.

[1] After the decision on the former appeal the cross-bill was elaborately amended, praying for specific relief outlined in subparagraphs b, c, d, e and f of the prayer to the cross-bill. Several grounds of demurrer addressed to these subparagraphs are made bases for assignments of error on this appeal, the demurrer having been overruled by the circuit court. Some of these assignments are stressed in argument by appellant. It is sufficient to observe that where a pleading in equity is sufficient in other respects and contains a proper prayer, it is not demurrable, because of a prayer for further but unwarranted relief. Wilks v. Wilks, 176 Ala. 151, 57 So. 776.

Woodward, after making several minor bequests including provision for his wife with respect to which he stated in his will, "The devises, bequests and provisions made for my wife, Annie Louise Woodward, are in lieu of dower or any distributive share or other interest in my estate, statutory or otherwise," bequeathed to the First National Bank of Birmingham, Alabama, as fiscal trustee, the residue of his large estate, consisting of real and personal property of the value of more than five million dollars, as a foundation for an educational trust to establish and maintain a system of schools, which he outlined in his holographic will, vesting in the fiscal trustee and its successors the legal title of all the property in said residuary estate, with specific powers in respect to the investment and care of such trust property, some of which is enumerated in Section (c) of said will. The will also names a self-perpetuating Board of Governors constituted of seven men, to act without compensation, including Oscar G. Thurlow, who joined as a complainant in filing the original bill, and Keehn W. Berry, who was named as a defendant in said bill, along with the other members of the board not made complainants, conferring on said Board of Governors numerous and sundry duties and powers, among others:

"The Board of Governors shall be and is hereby expressly charged with the duty of carrying into effect the educational trusts herein provided and of directing the expenditure of the income from said trust estate and the principal thereof for the purpose and in the manner herein provided. To this end I vest in said Board of Governors the power and authority to do any act or thing and to make any expenditure of funds of said trust estate which in the opinion of the said Board of Governors is necessary or desirable in carrying into effect the provisions hereof and the trusts herein created, in accordance with the provisions hereof, subject only to the requirement that said Board of Governors shall act in good faith."

Another provision in the will is: "The Board of Governors will find among my papers much data with reference to the school, representing the result of several years investigation by me, and they are directed that my evident intents are to be given preference over their own or other ideas, when not in conflict with five of the Board members; * * *."

The will further provides:

"The Board of Governors shall keep the Trustee advised of its plans in order that the investment of the funds of the trust estate may be so handled that the directions of the Board of Governors for the expenditure of money may not result in unnecessary embarrassment to the Trustee or loss

to the estate in providing such funds when called for. In taking action calling for the expenditure of funds, the Board of Governors shall give consideration to the condition of the trust estate and the nature of the investment thereof and the total value of the trust estate, and so control its expenditure of funds that the disbursement out of the assets of the estate may not impair the trust estate to the extent that it may endanger the full consummation of the plan herein provided. They may expend principal for school sites and buildings and as specifically provided."

### The "Backlog Provision"

"To avoid expenditure in excess of that justified by the size of the trust estate, I direct that before making an expenditure for the original unit of the school, whatever its size, or any subsequent unit or addition to an existing unit, the Board of Governors shall first make or cause to be made a careful estimate of the cost of such unit or addition and the amount required annually for the upkeep and operation thereof. The Board shall make the expenditure for such unit *only if and when there shall remain in the trust estate property or securities other than school properties,* after deducting the estimated cost of such unit, which will produce income, after' paying all expenses other than the cost and expenses connected with the operation of the schools, *equal to 200% of the actual cost of operation of the unit or units of the school then in operation, if any,* and the estimated cost of operation of the unit, the construction of which is then contemplated; provided, further, that in addition to the foregoing there shall be other income producing assets (excluding school properties) of the value of Three Million Dollars ($3,-000,000.00), the income from which shall be added to said Three Million of Dollars to help provide the funds for the next unit. 'School properties' as used herein means the school site, buildings, equipment and other properties actually used in the conduct of the school.

"If, after completion of the second unit, it should be apparent to the Board of Governors, that Three Million Dollars is more or less than needed for the basis of another unit, *then they may change the amount, to such figure, from time to time, as they deem advisable.*" [Italics supplied.]

Following the "backlog provision," the character of the school is outlined and the beneficiaries of the trust are enumerated as "young white boys, sound and normal in mind and body (cripples excluded), so that on their entrance into manhood they, in the practice of the principles of truth, morality and justice and by right living, may assist in elevating American citizenship * * *." Following this the testator observed: "I charge upon the Board of Governors hereunder the duty to and I direct that with the trust estate and the income therefrom they shall establish and maintain a school, as hereinafter provided, for the education of such young white boys, complying with the qualifications herein provided."

As to the teachers who are to vitalize and implement the school as directed in the will the testator observed:

"A headmaster of not under thirty-five or over fifty years of age, who is interested in and likes boys, and knows their psychology, who has had much experience with them, who is not weded to any 'system,' who sees and approves of this scheme as a whole, who has a minimum of prejudices, intolerance and of 'cocksureness,' shall be employed at least a year before the school is started and give his entire attention to the needs of the school and preparations for it in all ways. This school, if successful, is to grow in a natural way to the size of two hundred pupils, and become the first unit of the units provided herein—When the first school, in the judgment of the Board of Governors, is reasonably sure of growing as planned, new buildings may be erected, on the same general site, planned as the type of future units.

"No advertising for this first school will be done, but pupils will be obtained by personal solicitation of the teachers who have been engaged.

"This first school or unit is to be continued at least twenty-five years, if there are any pupils. If after twenty-five years of operation, there are not one hundred pupils, then Section (k) and following of this instrument is to govern."

The general physical plan of the school is outlined, followed by this direction:

"Such separate and additional units shall be established and maintained only if and when the condition of the trust estate shall safely permit of the establishment and maintenance of such separate and additional units from time to time, *after the first unit is in complete and successful operation,* and when the establishment and maintenance of such additional units can be done *in compliance with the foregoing provisions hereof.* * * *

"Each unit shall be limited to two hundred pupils, but during the first half of any school year an additional number over two hundred may be introduced to provide for probable eliminations prior to the beginning of the second half of such year." [Italics supplied.]

The testator made certain observations and directions as to the curriculum, course of study and outside touches and associations of the pupils of the school. Then, suggests:

"As the plans for the opening of each unit of the school are put in shape, the Board of Governors shall provide for a sufficient number of teachers, assistants and other necessary agents and shall thereafter from time to time provide for additions to and changes in such number as conditions may show to be necessary or desirable. The number of teachers shall be sufficiently large to give individual attention to the work and needs of each pupil—not less than one instructor to ten pupils. (Probably more will be needed.) Each teacher, assistant or other agent shall be a man of high character and integrity. *It is directed* that the teachers come—for the first twenty-five years of each unit—from north of an east-west line through Cincinnati, Ohio, that the pupils may learn from contact, that the men from 'the north' are essentially the same as men from 'the south,' also that pupils will benefit by illustrations of life and things used by the teachers, but tending to be different from the illustrations that would be used by a teacher raised in the south. I suggest this as a permanent rule—it has advantages. One of the teaching staff is to be a physician, who can give the boys such attention, in common ailments and accidents as is necessary, but serious cases are to be taken at once to the nearest hospital. This physician will also have general charge of the feeding. I prefer that he be of the homeopathic school. No person shall be employed who shall not have shown skill in the teaching of boys and who is not well fitted by temperament, education and experience to accomplish the best results therein. In all cases persons shall be chosen on account of their merit and not through favor and intrigue."

The will further provides:

"The pupil's expenses for board must be paid by him, and the Board of Governors shall require each pupil at the school to pay such tuition as the Board of Governors in its discretion may deem necessary to fully accomplish the objects of the institution, keeping in mind that *the school is for the average boy and is not intended to be a charity.* On the basis of present conditions it seems to me that the tuition should be Two Hundred Dollars per school year, and certainly not less than One Hundred Dollars per school year." [Italics supplied.]

The will further provides:

"The Board of Governors shall provide for determining the order in which persons applying for admission shall be admitted, giving preference, however, to (1) those with English or British ancestry; (2) those best fitted, (3) those born in Alabama, in the order named.

"No pupil, except those of British ancestry, shall be admitted unless his father and mother were both natural born citizens of the United States and unless such parents were of the Caucasian or white race. Each pupil shall be a natural born citizen of the United States. * * *"

The will states the general object of the school in the following language:

"The general objects of this school are; to furnish the average boy with a basic knowledge and appreciation of the environment in which he lives and especially of himself and his fellow man; to help him to realize the daily life the average person must live; to control his emotional and sentimental impulses and to face the facts;

to supply some basic knowledge of all the basic sciences, taught in a coordinated correlated way; to enable the boy to earn a living; to make his life more worth living, by deriving the maximum of happiness from it.

"The basic idea of the school is to make, for the boy of sound mind and body, the best foundation for real manhood and citizenship. It is self evident that the best superstructure on a weak foundation must eventually show the poor foundation. It is intended to give the boy as many experiences, in the use of all his senses as possible, so that he may be able to attain maximum use of hands and mind in daily life.

"One of the objects of this school is, so training the mind and body of the pupil that he may apply his own faculties to facts which come to his knowledge throughout life and arrive at sound and proper conclusions; and I have not intended that the school should strive to fill the pupil with more or less disconnected patches of information in the hope that he will find a place some day for their use.

"The school is not in any of its parts to become a preparatory school, not to be or become a college or university, not be or become a trade or technical school. Its purpose is to educate the average boy for the specific but broad purpose of making of him a better rounded man that usually results from so called specific education,—one who knows, appreciates and can apply the methods of learning."

The will further provides:

"Section (k). While I am firm in the conviction that an educational institution of the type and character hereinbefore provided, *if sufficiently endowed* and properly conducted will be permanently successful, I am not unmindful of the possibility of error of judgment in this respect on my part. *I direct* that it be given a fair trial for twenty-five years, as I have provided. If after the first unit of the school shall have been conducted for a period of twenty-five years from the date on which it is opened for the introduction of pupils, the maximum number of pupils enrolled for a school year during the last five years of such twenty-five year period shall not have reached one hundred, then the Board of Governors by a vote of five of the members of said Board, may modify any restriction or requirement contained in Section (j) of this Item Tenth of my will with reference to said school, except those relating (1) to races, (2) to religion, (3) to size of unit, (4) to research by faculty members, (5) to conferring of degrees and commencement or graduation exercises, or (6) to athletic games with those outside the school, to the end that it may be made a successful school.

"In the modification of said restrictions, I direct that the members of the Board of Governors shall keep before them the general aims of the school I have provided for and strive to accomplish those aims by the modifications the Board makes." [Italics supplied.]

The Board of Governors is invested with discretion to make other modifications of the restrictions employed in Section (j) on the development of certain conditions, indicating that the school cannot be properly maintained in Alabama. In said Section (k) it is further provided:

"With this discretion vested in the Board of Governors I can see no reason why the school should fail; but if the Board of Governors shall declare the school unsuccessful as to Alabama and shall determine that it is unwise to try a unit in a State other than Alabama, or if the Board of Governors shall declare the school unsuccessful in Alabama and after trying a unit located elsewhere than in Alabama, shall declare such other unit—located outside Alabama—also unsuccessful, then the trust estate and the income therefrom shall be subject to the provisions of Section (m) of this Item Tenth hereof. I realize that said Section (m) hereof may not become applicable under the foregoing provisions hereof until the expiration of a period of seventy-five years after the first unit of the school is established. * * *."

In Section (1) the testator made the following suggestion:

"I suggest that the trust created under this Item Tenth of my will shall be known as the Alabama Educational Foundation. If such name is not available, the Board of Governors may select a name. I direct

that the name of an individual shall not be used in the name of the trust or of any of the units of the school. I suggest that the names given to each unit of the school be related in some way to the geographical location of the unit."

The major contentions of the appellants are, that the language in the "backlog" provision is mandatory and the Board of Governors in no circumstances have any discretion or authority to deviate therefrom. That said provisions constitute a basic element of the trust essential to its preservation, and it is not within the power of a court of equity to authorize the Board of Governors to deviate therefrom. These provisions are:

"The Board shall make the expenditure for such unit only if and when there shall remain in the trust estate property or securities * * * equal to 200% of the actual cost of operation of the unit or units of the school then in operation, if any, and the estimated cost of operation of the unit, the construction of which is then contemplated; provided further, that in addition to the foregoing there shall be other income producing assets (excluding school properties) of the value of Three Million of Dollars ($3,000,000.00), the income from which shall be added to said Three Million of Dollars to help provide the funds for the next unit. 'School properties' as used herein means the school site, buildings, equipment and other properties actually used in the conduct of the schools."

The contentions of the appellees on the other hand are that these provisions are cautionary and administrative in character; that the corpus of the trust was depleted by the dissent of the widow from the will, a fact not disputed, and an event not anticipated by the testator at the time he wrote his will. Therefore, a court of equity may authorize the Board of Governors to deviate from these administrative directions if such deviation is necessary to carry out the settlor's intent, and this can be done without endangering the trust.

These issues and contentions were presented to the circuit court upon final hearing of the case upon pleadings and proof eventuating in the decree from which this appeal is prosecuted.

In the light of the evidence adduced on the trial, much of which was ore tenus, the question as to whether or not the "backlog provisions" are mandatory and not subject to deviation or instructions of the court administering the trust is a question of law. If this question is answered in the affirmative, the controversy between the parties as to the feasibility and practicability of establishing the school provided for in Section (j) without endangering the trust, becomes immaterial. On the other hand, if said provisions are administrative in character and the intent and purpose of the testator cannot be accomplished without a deviation therefrom, and whether or not such deviation would foreshadow the ultimate destruction of the trust, is a question of law and fact to be determined by the court in the light of the evidence adduced on the trial.

■■ It has been authoritatively stated that the intent and purpose of the settlor of the trust is the law of the trust. Lovelace v. Marion Institute et al., 215 Ala. 271, 272, 110 So. 381. And, again, " 'The fundamental and cardinal rule in the interpretation of wills is that the intention of the testator, if not inconsistent with some established rule of law or with public policy, must control, and it is the duty of the courts to ascertain such intention and to give force and effect to the scheme that he had in mind for the disposition of his estate.' 30 Am. & Eng. Ency. Law, (2d Ed.) p. 661." Castleberry v. Stringer, 176 Ala. 250, 57 So. 849, 850.

We reaffirm these principles as the settled law in this jurisdiction.

■ It is also familiar law that "The court will direct or permit the trustee to deviate from a term of the trust if owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purposes of the trust; and in such case, if necessary to carry out the purposes of the trust, the court may direct or permit the trustee to do acts which are not authorized or are forbidden by the terms of the trust." Restatement, Law of Trusts, Vol. 1, § 167; Restatement, Law of Trusts, Vol. II, p. 381; Lovelace v. Marion Institute et al., 215 Ala. 271, 110 So. 381; 54 Am.Jur. p.

224, § 284; Scott on Trusts, Vol. 3, p. 2044, § 381.

■ This doctrine of equitable deviation applies to private as well as to charitable trusts. Authorities supra.

The settlor clearly contemplated and intended that administration of the trust in the experimental effort to establish the system of schools should continue for an indefinite period, at least for three-quarters of a century, and it falls clearly within the reason of the rule applicable to charitable trusts, stated in Scott on Trusts, § 381 supra.

The rule is stated in Lackland v. Walker, 151 Mo. 210, 267, 52 S.W. 414, 431, recognized in the Lovelace case as a leading authority, " * * * generally, where a change of circumstances, or the happening of unforeseen or unprovided for contingencies, makes it necessary for the protection of the charity that the form of administering the fund should be changed," a court of equity may authorize deviation. See also Scott on Trusts, Vol. III, p. 2044, § 381; 54 Am.Jur. p. 224, § 284; Heustess v. Huntingdon College, 242 Ala. 272, 5 So.2d 777; Dunn v. Ellisor, 225 Ala. 15, 141 So. 700; Noble v. First Nat'l Bank, 236 Ala. 499, 183 So. 393.

■ An exception to this doctrine stated in Lovelace v. Marion Institute, 215 Ala. 271, 110 So. 381, is that property devoted to physical use in carrying out the trust and upon which the institution provided for is supposed to rest, cannot be sold or encumbered, if such sale or encumbrance is prohibited by the instrument creating the trust. The facts of this case do not bring it within this exception.

■ The writer deems it not improper to observe that he was deeply impressed during the argument at the bar with the contentions of appellant that the "backlog provisions" were mandatory and not subject to the doctrine of equitable deviation, but on mature consideration is of opinion that the same are administrative in character and are mandatory only to the extent that the Board of Governors cannot deviate therefrom except by unanimous agreement and concurrence in the wisdom of the contemplated act, and that the contemplated act will not jeopardize the stability of the trust. Said provisions are highly cautionary, looking to the preservation of the trust, and the duty of acting to establish the first unit of the school is enjoined on the "Board of Governors," while in respect to other actions in respect to other matters, the will authorizes deviation by a concurrence of five members; and in other instances, a majority is authorized to act. The controversy and divergent interpretation of the members of the Board as to the meaning and effect of the "backlog provisions" and the power of the Board to deviate therefrom is the foundation for a proceeding in equity for interpretation of the will and instructions in respect to future administration of the trust. This was foreshadowed in the opinion on the first appeal, when it was observed:

"So that the issues seem to be clearly drawn, as to whether the conditions of section (h 4) are mandatory and have application to section (j), and have been fulfilled. If they do not apply to section (j) or have been fulfilled, the Board is vested with a discretion which is conclusive of its power to proceed under section (j), or otherwise, in the exercise of good faith.

"If those conditions (h 4) do apply to section (j) and are mandatory, and not fulfilled, then it would seem that the original complainants and cross-complainants may each present their contention to the court and have it determine on the principle of approximation whether it would best serve the purpose of the will to proceed to set up a school in their discretion or to act under section (m). It would seem therefore that the parties are at liberty to have the court direct them in this regard, but since the trial court has not yet considered and determined the question there is nothing here for us to review in that connection." Thurlow v. Berry, 247 Ala. 631, 636, 25 So.2d 726, 731.

■ Whether or not the doctrine of cy pres has been established in this state by § 145, Title 47, Code of 1940, referred to in the opinion of this court in Heustess v. Huntingdon College, 242 Ala. 272, 5 So.2d 777, is not material here. That doctrine, as interpreted by our decisions, only applies where there is no one of the beneficiaries

606

provided for in existence. Carter v. Balfour's Adm'r, 19 Ala. 814; Lovelace v. Marion Institute, 215 Ala. 271, 110 So. 381.

.There is nothing in the instrument settling the trust indicating that the trust was created for accumulation only. The clear purpose of the settlor was that the trust and income therefrom were to be used actively in establishing and maintaining the system of schools provided for in the will.· See Ramege et al. v. First Farmers & Merchants Nat. Bank of Troy, ante, p. 240, 30 So.2d 706.

The decree of the court as we interpret it does not rewrite any provision of the will but merely construes the will and applies to the "backlog provision" the doctrine of equitable deviation followed by the advice of the court to the Board and the fiscal trustee to proceed with the establishment of the first unit of the school in accordance with the expressed intention and purpose of the testator and settlor of the trust.

Any interest or probability of the Massachusetts Institute of Technology being called upon to participate in the administration of the trust in any way is purely a contingency far removed from the experimental efforts of the Board of Governors to establish and maintain a system of schools outlined by the testator. The·decree approving that party's disavowal of interest is not questioned on this appeal. Nor is that portion of the decree which directs the Board of Governors to accept as a part of the trust foundation the property embodied·in the declaration of the educational foundation, which seems to be strictly in accordance with the purpose and intent of the testator.

The Board of Governors are required to act without compensation and this proceeding was instituted by the minority members in good faith and in the interest of the trust. We are therefore of opinion that it is proper to require the fiscal trustee to pay the costs of this appeal incurred in this court and in the circuit court.

No error appearing on the record, it is ordered that the final decree be and the same is hereby in all things affirmed.

Affirmed.

All the Justices concur.