61 So.2d 55

**GOODMAN et al. v. McMILLAN et al.**

3 Div. 629.

Supreme Court of Alabama.

Aug. 27, 1952.

Rehearing Denied Nov. 6, 1952.

H. L. Anderton, Birmingham, for appellants.

Hugh M. Caffey, and McMillan, Caffey
& McMillan, all of Brewton, for appellees.

128

SIMPSON, Justice.

The appeal challenges the construction placed by the trial court on two provisions of an irrevocable trust created by an instrument executed March 28, 1929, by the late D. W. McMillan, a wealthy physician of Pensacola, Florida.

The instrument provided that the administration of the trust should be transacted in a court of competent jurisdiction in Escambia County, Alabama. Ed. Leigh McMillan, attorney of Brewton, Alabama, and cousin of trustor, was named the principal trustee and since the execution of the instrument has acted exclusively in that capacity.

The trust provisions under consideration are those designed at the time of the execution of the trust to benefit the trustor's then wife, Florence McMillan, and her daughter, Frances Brodsky, the appellants here, complainants below, who claim its benefits by the bill as last amended.

The instrument in so far as pertinent provided that after the trustor's death "and during the lives of my wife, Florence McMillan, [and others] * * * all net income and profit, so derived, shall by my said trustee or trustees be paid to the following named persons, in the following

amounts, for the following times, and used for the following purposes:

"(a) There shall be paid to my widow, Florence McMillan, the sum of one thousand dollars ($1,000.00) per month so long as she shall live and remain my widow.

 * * * * * *

"(d) In the event that either of my cousins Ed. Leigh McMillan or Malcom McMillan, or any of the family or lineal descendants of either; or either of my stepdaughters, Annette Woods or Frances Brodsky, should during the continuance of this trust, be in want or needy circumstances,— then in any of said events my trustee or trustees shall use and devote so much of said income and profits not otherwise divested as he or they may deem necessary or proper for the support, comfort and wellbeing of those or any of those so in want or in needy circumstances."

The trial court ruled that the complainants were not entitled to relief. We are in accord with that decree. The two provisions will be discussed in order.

### Provision (a)

█ This section of the instrument sought to make provision during the life of his "wife", Florence McMillan (now Goodman), so long as she should live and remain his widow. But Florence McMillan was not the trustor's wife at the time of his death in 1936 and therefore never could be his widow. He had previously obtained a divorce from her in 1933 in the chancery court of Escambia County, Florida, on the ground of adultery. That decree was affirmed on appeal by the Supreme Court of Florida, June 25, 1935. See McMillan v. McMillan, 120 Fla. 209, 162 So. 524. So the primary inquiry is whether appellant, after having been divorced from trustor in his lifetime, could take under subdivision (a) of the trust after his death as his widow. Posed in more judicial language, does an estate conditioned and limited to the survivorship of the settlor's wife as his widow vest in her at his death when she was not then his wife by reason of a previous divorce *a vinculo*

between the couple. Clearly, the authorities do not conduce to such a conclusion.

The first guiding rule is well recognized. The intention of the settlor is the law of the trust and if the nature, subject matter and objects are reasonably ascertainable and the scheme not inconsistent with some established rule of law or public policy, that intention must control and the courts will sustain and give it effect. Stariha v. Hagood, 252 Ala. 158, 163, 40 So.2d 85; Thurlow v. Berry, 249 Ala. 597, 32 So.2d 526.

In appraising the intention of the settlor here from the language of the instrument, in the light of ordinary knowledge of human affairs and relationships, none but the naive could believe that it was the intention of the trustor that his unfaithful divorced wife should share in the benefits of the trust under provision (a) as his "widow" after his death. Unless the instrument clearly imports such an intention, as it does not, the law, as we say, should not operate to that result.

The gift under (a) is not to Florence McMillan, "a widow," but to Florence McMillan, "the widow" of trustor, to continue during her said widowhood. Such a gift imports one because of and in consideration of the marital relation and clearly contemplates the wife to be in lawful wedlock with him at her husband's death. 122 A.L.R. 116, n. 27; 18 A.L.R. 2d 712; 35 Am.Jur. 354, par. 251, n. 4; Bell v. Smalley, 45 N.J.Eq. 478, 18 A. 70; Boddington v. Clairat, L.R. 25 Ch.Div. 685, 50 L.T.N.S. 761, 25 Eng.Rul.Cas. 489; Re Kettlewell, 98 L.T.N.S. (Eng.) 23; Iles v. Iles, 158 Fla. 493, 29 So.2d 21.

The divorce between the parties severed the marriage relation and thereafter Florence McMillan was no longer the wife of Dr. McMillan. In contemplation of law each was then a single person and she could never thereafter (except by a subsequent valid marriage with him) have been his widow at his death. A widow in contemplation of law is a wife who outlives her husband, not an ex-wife who had theretofore been divorced from him. Alabama Pension Commission v. Morris, 242 Ala. 110, 112, 4 So.2d 896, 897.

The Morris case gave that connotation to the term where the petitioner was claiming a widow's pension from a previously divorced husband. The court observed:

"* * * Petitioner was not entitled to claim as the widow of Moore, inasmuch as the marriage to Moore was dissolved by divorce before his death and she did not become his widow at his death. Code of 1940, Tit. 60, § 7."

The uniform current of opinion has been harmonious to this view. Many authorities are collated in 45 Words and Phrases, under Titles "Widow," pages 138 et seq., and "Wife," pages 153 et seq., and it is not necessary to burden the opinion with these citations.

Another insistence is that a later executed will by trustor before his divorce, making mention of and approving subdivision (a) of the trust instrument, and a codicil thereto after the divorce revoking certain specific bequests to complainant in the will, but concluding "I hereby ratify and confirm my said last will and testament in all other respects," indicated an intention on the part of the testator that provision (a) still remain effective for his divorced wife. We do not think so. If these subsequently executed instruments could have affected the terms of the irrevocable trust or illustrated the intention of the trustor in that regard—a matter we need not decide—they are all too indefinite in verbiage to contradict another subsequently executed instrument by the trustor after his divorce which specifically explained that subdivision (a) was conditioned on the complaint's being 'in wedlock with him at his death and remaining his widow, and that the divorce had the effect of nullifying the estate thereby created.

To avert the effect of this construction, complainant through learned counsel advances as an additional proposition to sustain the trust that about three years after the Florida divorce and some several months before Dr. McMillan died, these parties entered into a common law marriage in Alabama, thereby bringing her within the terms of the trust and permitting her to take as his widow. Much of the evi-

dence in this rather voluminous record was addressed to that phase of the case. Here also, however, we must conclude with the trial court against the contention of complainant. The courts will closely scrutinize a claim of common law marriage, 55 C.J.S., Marriage, § 45, page 911; Whitman v. Whitman, 206 Miss. 838, 41 So.2d 22, and on the record presented we do not think the evidence sufficient to establish by that clear and convincing proof requisite in such cases that any such relationship ever existed between the parties.

■ The rule governing has been restated in many of our recent cases.' There must be a mutual understanding to presently enter into the marriage relation, permanent and exclusive of all others, after which there is a public recognition of the existence of the common law marriage. There must be (1) a present agreement to take each other as husband and wife and (2) this must be followed by cohabitation or the *mutual assumption openly of marital duties and obligations*. Jenkins v. Avery, Ala.Sup., 59 So.2d 671;[1] Whitworth v. Whitworth, 256 Ala. 296, 54 So.2d 575; Turner v. Turner, 251 Ala. 295, 37 So.2d 186; Murphy v. Jacobs, 249 Ala. 594, 32 So. 2d 306; Campbell v. Rice, 245 Ala. 395, 17 So.2d 162; Gilbreath v. Lewis, 242 Ala. 510, 7 So.2d 485.

■ Mere cohabitation and repute or circumstances which only show mutual consent of the parties do not establish of themselves a common law marriage. There must be words of present assent *"per verba de praesenti"* to lawfully contract marriage, followed by cohabitation or the open mutual assumption of marital duties and obligations. Turner v. Turner, supra; In re Price's Estate, 129 Fla. 467, 176 So. 492; Whitworth v. Whitworth, supra.

A brief recital of the evidence bearing on this issue will suffice to illustrate there was no real common law marriage between this couple. Complainant does testify and this testimony is somewhat corroborated that she did cohabit with Dr. McMillan in Birmingham on the night of March 16, 1936, and one or two nights following in Montgomery, Alabama, and that Dr. McMillan introduced her in Montgomery as his wife. Here, however, the evidence is lacking to show definitely either prerequisite to establish a common law marriage. Complainant testifies that she was "reconciled" with her divorced husband and slept with him that night in Birmingham and later in Montgomery, but to be reconciled only implies—if that—a present agreement to take each other as husband and wife. As refuting any such claim the evidence is without dispute that on March 20, 1936, complainant and Dr. McMillan parted and were never together again. He lived several months after this, but she never saw or attempted to see him again. She never visited him during his fatal illness and did not attend his funeral. She was living in a rented house in Montgomery, Alabama, and he in his home in Pensacola, Florida, where previous to the divorce they had resided; yet she never sought to reestablish herself in that home as his wife. When she fell into financial trouble and her effects were attached for rent, she did not call on Dr. McMillan, whom she now claims to have been her lawfully wedded common law husband, but seemingly called on her erstwhile corespondent in the divorce suit, whom she thereafter married. She admits writing Dr. McMillan three letters after this "reconciliation," in which, among other things, she said that she intended to go her way and to let him go his and that they were to remain merely "friends." This she seems to have done. In one of these letters she requested that Dr. McMillan have her church membership changed from Pensacola, where he resided, to Montgomery, where she resided. She wrote of her intention to move to Atlanta to get a job and invited him to visit her there if he should happen to come through Atlanta. She also in her letters wrote and in her testimony spoke about trying to get positions to support herself. These acts are inconsistent with the theory of a common law marriage. In contradiction to her claim that the purpose of the meeting in Birmingham was for a reconciliation and a resumption of their marital relations, there

1. 257 Ala. 387.

is credible record evidence that the purpose of their meeting in Birmingham and later in Montgomery was for Dr. McMillan to obtain some of his household goods and effects which she had removed from his home following the affirmance of the divorce decree by the Supreme Court of Florida, and to procure the dismissal of a half-million dollar suit for breach of a prenuptial agreement she had filed in the federal district court in Birmingham. After this meeting she signed a settlement agreement and this suit was dismissed, and her several communications to Dr. McMillan indicated that she was attempting to have redelivered to him this property pursuant to the agreement. The documentary evidence all leads to but one conclusion, that this was the purpose of the meeting which brought the parties together. Then, after this meeting and parting, when creditors of complainant presented bills to Dr. McMillan for certain purchases of merchandise, he promptly denied liability, referring the creditors to the previous divorce decree. Neither of them ever referred to each other as husband and wife after the divorce decree or after the alleged reconciliation party in communications with the trustee, who had before the divorce been sending to her at Dr. McMillan's request $1,000 per month of the trust funds, nor did she ever indicate to the trustee that she and Dr. McMillan had entered into any common law marriage nor make any claim against him for any funds as the wife of the trustor. Nor did Dr. McMillan ever refer to complainant with any terms of endearment nor express any desire or purpose to see her or have her present at his last illness. On the contrary, he seemed to have shunned her and his deathbed instructions to his trustee were, "Don't let them put anything over on you and look out for forgeries," the latter admonishment evidently prompted by an experience he had with one J. H. McCormick, who had forged some documents to indicate a reconciliation and remarriage and who was proffered as a witness for complainant.

We have pointed out in previous decisions the exigencies which brought about recognition of the common law marriage. That considerations of public policy, to protect the family status in a frontier country, inspired the adoption of the rule. But courts have been careful to deprecate and view with disapproval a status not clearly shown to have been a bona fide one and in our present day the pioneer conditions which fostered the rule no longer obtain. Each case must be determined on its own particular facts, having regard to the situations of the parties and their status in life. A pertinent inquiry is to determine the attitude of the parties with respect to marriage and the common law relationship. If the parties had in times past or subsequent to the claimed relationship recognized or entered into the common law marriage, then this might have weight, but such is not the case here. Before complainant's marriage to Dr. McMillan she had been previously married in a ceremonial marriage. She and Dr. McMillan likewise had a ceremonial marriage. She has been married twice since his death, each time by a ceremonial marriage. She has two married daughters and their marriages were, each time, ceremonial. These circumstances likewise weigh against the attenuate claim of a common law marriage. The complainant in answer to all this says that it was different with her and Dr. McMillan, since they had already been married, but we fail to appraise the distinction. It would seem to us to have been all the more essential to have had a ceremonial marriage, with that public recognition so requisite to establish such a status. These people were not frontier people without opportunities of ceremonial marriage, nor were they of the lower caste who might be insensitive to the propriety of any other status. They were gifted with refinement, talent, wealth, and an abundant knowledge of the world, and the court is unwilling to suppose that from the adumbrant and tenuous manner of their reunion they ever did undertake again the serious consequences of matrimony, from the bonds of which they had not so long been extricated and which had been originally cemented by a formal ceremony. The overwhelming proof negates the idea of a common law marriage as recognized in this jurisdiction.

132

Some argument is made that this matter of the common law marriage was res judicata because, after the death of the trustor, it was so adjudged in a proceeding in the United States District Court in a suit between complainant and her former attorneys involving establishment of an attorney's fee. There is not enough of these proceedings to determine the character of the litigation in which the attorney's fees were allowed and this was, of course, the complainant's burden. It does appear, however, that Ed. Leigh McMillan, the trustee, was made a party to the proceedings and later was dismissed from the litigation on his motion. The estate of the trustor does not appear to have been a party and whatever adjudication with respect to the matter might have been made in litigation between complainant and her attorneys was clearly ex parte and not binding on the trustee or the estate of the trustor. A plea of res judicata must show that the former controversy was between the same parties about the same subject matter and that the adjudication was upon the merits, and so much of the proceedings in the former case as is necessary to show such facts should be set out. Lange v. Hammer, 157 Ala. 322, 47 So. 724.

It is also argued to sustain this provision of the trust that the limitation of the estate to the widowhood of the trustor's then wife was void in restraint of marriage or unenforceable as *"in terrorem"* and, therefore, cannot be given effect; that the disposition "to my widow Florence Mc-Millan" is descriptive of the person and not designative of her status after his death and that, therefore, she is due to take. The provision is not subject to this construction. This is not a general limitation or condition in restraint of marriage, as has been sometimes denounced as *in terrorem* or void against public policy, but is merely an estate to the trustor's widow during her widowhood and is approved by the authorities as valid. Vaughn v. Lovejoy, 34 Ala. 437. See also 35 Am.Jur. 363, § 262.

### Provision (d)

The contention here is that some money is due Frances Brodsky for an illness she suffered. This provision stipulates for payment to her of "income and profits" from the estate in the event she should "be in want or needy circumstances." Whether the trustee has an irrevisable discretion in this regard is not necessary to be decided. A sufficient answer to the contention is that there is no pleading or proof to bring into review this provision of the trust. There is evidence that at one time this party suffered from a serious illness and underwent considerable expense in an effort of cure. But there was no allegation of any needy condition or competent proof to that effect. Relief afforded by a decree must conform to the case made by the pleading as well as the proof, and the case wholly fails in this respect to authorize a decree under subdivision (d). Bain v. Howell, 252 Ala. 458(1), 41 So.2d 588; Majors v. Killian, 230 Ala. 531(11), 162 So. 289.

We think the decree below well sustained. Affirmed.

LIVINGSTON, C. J., and FOSTER, LAWSON and GOODWYN, JJ., concur.