# Herd *v.* Herd.

## *Administration.*

(Decided October 14, 1915.   69 South. 885.)

1. *Marriage; Statutory; Validity; Delegating Authority to Issue License.*—Where a judge of probate issued to a justice of the peace several marriage licenses signed in blank, and such justice filled out one of such licenses with the names of the parties desiring to be married, and proceeded to perform what he considered to be a marriage ceremony at the woman's house asking the usual questions, there was no valid, statutory marriage, since the judge of probate cannot delegate his discretion to issue marriage licenses, and the justice of the peace had no authority to issue them.

2. *Same; Common Law Marriages; Cohabitation.*—Where a marriage was invalid as a statutory marriage because performed under a license not properly issued, and such marriage, though made per verba de præsenti, was not consummated by cohabitation, it was not valid as a common law marriage.

3. *Same; Common Law Recognition.*—The common law mode of marriage by consent of the parties, without ceremony or solemnization, followed by cohabitation, is recognized in the state of Alabama.

APPEAL from Talladega Probate Court.

Heard before Hon. M. N. MANNING.

From a decree of the probate court granting letters of administration to Viola Herd on the estate of John P. Herd, deceased, Sadie Herd appeals. Reversed and remanded.

KNOX, ACKER, DIXON & BINGHAM, RICHARD B. KELLY, and J. B. ADKINSON, for appellant.

CECIL BROWNE, for appellee.

MAYFIELD, J.—This is an appeal from a decree of the probate court of Talladega county, granting letters of administration to appellee on the estate of John P. Herd, deceased. Whether or not the appointment was

proper is conceded to depend solely upon the question whether or not appellee was the wife of intestate.

(1) The case was tried under an agreed state of facts, which, so far as pertinent, were as follows: "It is agreed that on the 20th day of May, 1905, there was a marriage attempted to be performed between the said John P. Herd and said Viola Herd, or Viola Williamson, as she was at that time, by J. D. Langley, who was a notary public and ex officio justice of the peace in beat No. 11, Talladega county, Alabama; that said J. W. Langley at such time had in his possession several marriage licenses signed in blank by J. E. Camp, judge of probate of Talladega county, Alabama, which were sent him by said Camp, with authority to fill out and issue to such persons as applied to him to marry, and that he accompanied the said John P. Herd and another to the residence of Viola Williamson's father, and in his presence and that of her mother, and after filling out a marriage license, the original of which is hereto attached marked 'Exhibit A,' by writing in the name of Viola Williamson and John P. Herd as the contracting parties, proceeded to perform what he considered was the marriage ceremony, in which he asked each party 'Do you take' the other as man and wife, asking the questions usually asked in performing such ceremony. And it is further agreed that both parties assented to the same, and thereupon he pronounced them man and wife; that after said alleged ceremony took place said J. W. Langley left the house of said Viola Williamson, or Viola Herd, accompanied by John P. Herd, and that said John P. Herd had never lived with said Viola Williamson after such time, or cohabited with her, or in any way contributed to her support; that on or about the 12th day of September, after said alleged ceremony, there was born to the

said Viola Williamson, or Viola Herd, a child called Marvin, which was the child of said John P. Herd. It is agreed that said John P. Herd did have sexual intercourse with said Viola before May 20, 1905, and some five months before said date; that at the time of said alleged marriage each said party, John P. Herd and Viola Williamson, were of marriageable age and theretofore unmarried. It is agreed that after such time that witnesses for the said Viola Herd, or Viola Williamson, would testify that John P. Herd stated that said child was his child and that said Viola was his wife. It is further agreed that during the time from the 20th of May, 1905, until the time of John P. Herd's death that he lived with his mother, Margaret E. Herd, about 2½ miles from Sylacauga, and that said Viola Williamson, or Viola Herd, lived with her father in the town of Sylacauga, Alabama."

It has long been the settled law of this state that acts and circumstances such as here recited do not constitute a valid statutory marriage, because the justice of the peace has no authority to issue the license.—*Campbell v. Gullatt*, 43 Ala. 57; *Beggs v. State*, 55 Ala. 108; *Ashley v. State*, 109 Ala. 49, 19 South. 917; *Hawkins v. Hawkins*, 142 Ala. 571, 38 South. 640, 110 Am. St. Rep. 53. In fact, there is no contention to the contrary in this case, but it is conceded that there was no statutory marriage. It is sincerely contended, however, that the agreed statement of facts does establish a common-law marriage, a form of marriage recognized and treated as valid in this state; and the trial court found and decreed in line with this contention.

(1) It is insisted by the appellee, and was so held by the acting probate judge, that if the contract be made per verba de præsenti, as was done in this case, then

it is not necessary that the agreement be followed by cohabitation, to constitute a valid common-law marriage; that subsequent cohabitation is necessary only where the agreement is per verba de futuro. The contention of appellant is that cohabitation must follow the agreement, though it be per verba de præsenti, in order to constitute a valid common-law, or informal, marriage, as it is indiscriminately called by law-writers on the subject. The question for decision here is therefore single and clear-cut.

There is no doubt that there is authority for the contention of each party. It is said by no less eminent authorities than Mr. Greenleaf and Chancellor Kent that marriage is a civil contract, jure gentium, to the validity of which the consent of the parties, able to contract, is all that is required by either natural or public law. If the contract is made per verba de præsenti, though it is not consummated by cohabitation, or, if it be per verba de futuro, and be followed by consummation, it amounts to a valid marriage, in the absence of all civil regulations to the contrary.—2 Greenl. Ev. pp. 441, 442; Kent's Com. p. 87. Mr. Parsons, speaking of the question as stated by Chancellor Kent and Mr. Greenleaf, says: "Mr. Chancellor Kent, in the fifth and subsequent editions of his Commentaries, said: 'If the contract be made per verba de præsenti, and remains without cohabitation, or if made per verba de futuro, and be followed by consummation, it amounts to a valid marriage, *in the absence of all civil regulations to the contrary.'* In his first four editions he omitted the words which we have italicized. But these words seem to us extremely material. They make the statement accurate and certain. They leave, however, the real question undecided for all practical purposes; for in what civilized land

is there an absence of all civil regulations to the contrary? In the case of *Jewell's Lessee v. Jewell* [1 How. 219, 11 L. Ed. 108], which came before the Supreme Court of the United States, on error from the Circuit Court for the District of South Carolina, this precise question came up. The court below cited the above passage from Kent, but from an early edition, and therefore without the very material clause we italicize, and instructed the jury that this was law. Exceptions were taken, and the case was carried to the Supreme Court of the United States, where Taney, C. J., in giving the opinion of the court, refers to this instruction and says: 'Upon the point thus decided, this court is equally divided; and no opinion can therefore be given.' "—Contracts, vol. 2 (9th Ed.) star page 78.

"It would be impossible to discuss this subject fully either in the text or in the notes, without occupying too large a space. I would refer, therefore, to a very elaborate, and, as I think, accurate, investigation of the authorities and the law, in Jacob's Addenda to Roper on Husband and Wife, vol. II, pp. 445-475. I cannot but think that he places upon strong grounds his conclusion that a contract of marriage per verba de præsenti, without ceremony, or celebration of any kind, does not constitute a valid marriage at common law."—Id., star page 79, note.

It will be found that there are adjudged cases from some of the best courts, including those of New York, Pennsylvania, Colorado, and Alabama, holding the rule as declared by Mr. Greenleaf; but the weight, if not the majority, of the cases holds the contrary rule, that cohabitation must follow the agreement, even though it be made per verba de præsenti; and if it could be said that the weight or number was not as above indi-

cated, we would feel bound by our former holdings on the subject, since all of the authorities hold that the statutes have some effect in determining whether a ceremony and contract such as is shown in this case constitutes a common law or informal marriage.

As stated by Chancellor Kent and Mr. Greenleaf, such marriages or contracts are valid only "in the absence of all civil regulations to the contrary." As well said by Mr. Parsons, we know of no civilized nation or country which has not some civil regulations on the subject; and whether or not this regulation is to the contrary, or what effect such regulations have on the marriage, is for the courts of the particular states to say. Such contracts, agreements, or marriages as the one under consideration have been frequently considered by this court, and in almost every instance this court has said, whether dictum or decision, that, in order for marriages like this to be valid, the contract or agreement must be followed by cohabitation. It would consume too much time and space to attempt to review the text-books and adjudicated cases on this subject. There is not only lack of unanimity, but great conflict, and, in the language of the Supreme Court of the United States, the conflict amounts almost to a state of anarchy. It cannot be denied that there is high and much authority to the proposition that it is not necessary to the validity of a common-law or informal marriage that the contract, if made in the present, be followed by cohabitation. This court, however, held that such a contract of marriage, to be valid as a common-law marriage, must be followed by cohabitation. This court has never recognized the distinction which Chancellor Kent and Mr. Greenleaf made between contracts in præsenti and those in futuro. It has repeatedly held that cohabitation after the agree-

[Herd v. Herd.]

ment, whether it be in præsenti or in futuro, is necessary to the validity of a common-law or informal marriage; and it is conceded that this marriage must be upheld, if at-all, as a common-law marriage, and not as a statutory one.

We have two cases the facts of which we are unable to distinguish from the facts in this case. In both of these it was held necessary, to constitute a common-law marriage, that the agreement, though in præsenti, be followed by cohabitation. These two cases are *Ashley v. State,* 109 Ala. 48, 19 South. 917, and *Hawkins v. Hawkins,* 142 Ala. 573, 38 South. 640, 110 Am. St. Rep. 53. In *Ashley's Case,* it is said : "The issuance of a marriage license by a judge of probate is a ministerial and not a judicial act.—*Cotten v. Rutledge,* 33 Ala. 110. We are of opinion, however, that the duty of issuing marriage licenses under our statutes by the probate judge, though ministerial, is a duty involving discretion, official and personal, such as the law does not allow to be delegated to another, not authorized by statute to exercise it, as in the case of his regularly appointed and qualified clerk. —Code, § 195, as amended by Act Feb. 21, 1893; Acts 1892-93, p. 1190. It was admitted by the state that there was no cohabitation between the defendant and the woman, to whom he is alleged to have been united in marriage under said license, by said justice of the peace, on account of which he was prosecuted for bigamy. Thereupon the defendant by his counsel moved the court to exclude from the jury as evidence the paper purporting to be a marriage license to defendant and the woman therein named, because it was not a valid, but a void, license, and that 'the paper taken in connection with the ceremony performed by Pelt, in view of the admitted fact that there was no cohabitation between the par-

ties, does not constitute such a marriage license, as that a prosecution for this offense can be sustained.' This motion should have been granted, and not overruled. The alleged second marriage of defendant having been solemnized by a justice of the peace without a license, and not followed by cohabitation, was not valid either as a statutory or common-law marriage.—*Beggs v. State,* 55 Ala. 108."

In the other case (142 Ala. 573, 574, 38 South. 640, 641, [110 Am. St. Rep. 53]) it is said: "This ceremony was had under the supposed authorization of a paper in form a marriage license, but which had no legal status as such, having been in part issued by the magistrate himself by filling in the names and date of a license form which had been signed in blank by the judge of probate. There has never been any cohabitation of the parties as man and wife, nor sexual intercourse since —or even before—the ceremony. Leaving out of view the duress, this was no marriage. The formal apparent solemnization was without license, and hence inefficacious as a statutory marriage; and the formal consent to be man and wife was not consummated into that relation under the common law by cohabitation.—*Ashley v. State,* 109 Ala. 48, [19 South. 917]."

These two cases, and *Beggs' Case,* cited in the *Ashley Case,* were subsequently cited when this court, in defining a common-law marriage, said: "The requisites thereof are thus stated in 26 Cyc. at pages 836, 837: 'To constitute a marriage good and valid at common law —that is, in the absence of a statute otherwise specifically providing—it is not necessary that it should be solemnized in any particular form or with any particular rite or ceremony. All that is required is that there should be an actual and mutual agreement to enter into

a matrimonial relation, permanent and exclusive of all others, between parties capable in law of making such a contract, consummated by their cohabitation as man and wife or their mutual assumption openly of marital duties and obligations.' See, also, *Beggs v. State*, 55 Ala. 108; *Ashley v. State*, 109 Ala. 48, 19 South. 917; *Hawkins v. Hawkins*, 142 Ala. 571, 38 South. 640, 110 Am. St. Rep. 53."—*White v. Hill*, 176 Ala. 489, 58 South. 447.

In the case of *Tartt v. Negus*, 127 Ala. 308, 28 South. 715, it is said: "The common-law mode of marriage is recognized as valid in this state, and to constitute such marriage it is only necessary that there shall exist a mutual consent or agreement between the parties to be husband and wife, followed by cohabitation and living together as husband and wife."

(3) There are other cases to the same effect. See the following, where the holding is the same in effect: Marriage may be contracted in this state without ceremony or solemnization, by the consent of the parties, followed by cohabitation.—*Campbell's Adm'r v. Gullatt*, 43 Ala. 57; *Beggs v. State*, 55 Ala. 108; *Farley v. Farley*, 94 Ala. 501, 10 South. 646, 33 Am. St. Rep. 141; *Mickle v. State*, 21 South. 66. The common-law mode of marriage is recognized as valid in this state, and to constitute such marriage it is only necessary that there shall exist a mutual consent or agreement between the parties to be husband and wife, followed by cohabitation and living together as husband and wife.—*Tartt v. Negus; supra; Moore v. Heineke*, 119 Ala. 627, 24 South. 374. Whether under our statutes a legal marriage can be had without license and without solemnization was left an open and unsettled question in *Robertson v. State*, 42 Ala. 510. But in the subsequent case of *Beggs*

*v. State, supra,* it was held that a marriage without license from the judge of probate, and without solemnization by any person authorized by statute to solemnize it—merely by the consent of the parties, followed by cohabitation—is valid.—*Farley v. Farley, supra.* It is true that some of these cases were criminal, and not civil, as is this; but the question was necessarily the same—whether or not a common-law marriage could exist unless the agreement was followed by cohabitation.

It is argued by counsel for appellee that the *Ashley* and *Hawkins Cases* are distinguishable from this case, because in *Ashley's Case* the man was then a married man, and of course could not contract marriage; but the answer to this is that it is not necessary to constitute bigamy, that the second marriage be valid and binding, because the defendant must be married when he contracts the second marriage or assumes the marital relation; otherwise, he could never be guilty of bigamy. The statute against bigamy provides that "if any person having a former husband or wife living, marries another, *or* continues to cohabit with such a second husband or wife," such person is guilty, etc. Of course, the second marriage never could be bigamous unless the first was valid, and the first husband or wife was living when the second marriage is attempted. If, however, there could be any doubt on this subject, it is dispelled in the case of *Moore v. Heineke, supra.* That case was the contest of a will, and one of the grounds of the contest was that the will was procured through the fraud of the husband of the testatrix, in that he fraudulently represented to her that he was an unmarried man, and thereby induced her to be married to him, whereas he then had a wife living, and that he thus induced her to make the will offered for probate. An is-

sue was made as to whether or not the husband of tes-
tatrix was married, when he was married to testatrix,
and whether or not a common-law marriage existed be-
tween the husband and another woman. On this issue
the trial court charged the jury that: "If the jury be-
lieve from the evidence that John F. Gleason and Nellie
Gleason agreed to live together as husband and wife,
and agreed to be husband and wife in the state of Ohio,
then I charge you that John F. Gleason and Nellie Glea-
son were husband and wife."

The court, speaking through Brickell, C. J., said of
this charge: "The charge given at the request of the con-
testant, which asserts that Gleason and the alleged first
wife were in fact husband and wife if they 'agreed to
live together as husband and wife, and agreed to be hus-
band and wife in the state of Ohio,' ignores cohabita-
tion following the agreement as an element of a valid
marriage by mere agreement without solemnization.—
*Ashley v. State,* 109 Ala. 48 [19 South. 917]; *Mickle
v. State,* 21 South. 67; *Farley v. Farley,* 94 Ala. 503
[10 South. 646, 33 Am. St. Rep. 141]. But as the fact
of cohabitation was not disputed—was, in fact, admit-
ted—the proponent was not injured by the charge."—
119 Ala. 640, 24 South. 380.

What was said in the case of *Farley v. Farley,* 94 Ala.
503, 10 South. 646, 33 Am. St. Rep. 141, is, we think,
apt and conclusive here: "Whether, under our statutes,
a legal marriage can be had without license, and with-
out solemnization, was left an open and unsettled ques-
tion in *Robertson v. State,* 42 Ala. 510. But, in the sub-
sequent case of *Beggs v. State,* 55 Ala. 108, it was held
that a marriage without license from the judge of pro-
bate, and without solemnization by any person author-
ized by statute to solemnize it—merely by the consent

of the parties—followed by cohabitation, is valid. The statutes having been since re-enacted, without material change in phraseology, and as marriages may have been contracted on the faith of the decision, and the legitimacy of children depend on maintaining the rule therein declared, whatever may be our individual opinion as to the legality of such marriages under our statutes, we do not feel at liberty to depart from the doctrine in *Beggs v. State;* if deemed impolitic and unwise, the Legislature must furnish the remedy."

It therefore follows that the decree below must be reversed, and the cause remanded, that further proceedings may be had, and a decree rendered, in accordance with this opinion and the agreed statement of facts.

Reversed and remanded.

ANDERSON, C. J., and SOMERVILLE and THOMAS, JJ., concur.