This is an appeal from a decree of the Montgomery County Circuit Court revoking letters of administration previously granted appellant and ordering that appellee serve as administratrix of the estate of James W. Brown, deceased. We affirm.
James W. Brown died intestate July 11, 1977. Nine days later, pursuant to Alabama Code of 1975, § 43-2-40, appellant Matthis W. Piel filed his petition for letters *Page 92 
of administration with the probate court of Montgomery County. That petition was granted. On July 22, 1977 Doris Brown, the appellee, petitioned that court to revoke the appointment of Piel and instead to grant the letters of administration to her in accord with the statute. The matter was removed to the circuit court of Montgomery County on August 15, 1977 when appellee petitioned for a declaration of her rights as the deceased's widow. Following a trial judgment was rendered for appellee on November 4, 1977. Appellant's motion for a new trial was denied on November 30, 1977.
Mrs. Brown's success below was bottomed essentially upon the court's finding that she had statutory priority over Mr. Piel as administrator for the estate. Code of 1975, § 43-2-42
(formerly Tit. 61, § 81, Alabama Code (Recomp. 1958) provides that:
 (a) Administration of an intestate's estate must be granted to someone of the persons herein named if willing to accept and satisfactory to serve in the following order:
(1) The husband or widow.
. . . . .
 (4) Such other person as the judge of probate may appoint.
Mrs. Brown contended that she fit within (1) above as the widow of the intestate.
The primary issue is the legality of Mr. Brown's marital status. The uncontested evidence shows that the appellee, Mrs. Brown, and the deceased, James W. Brown, were legally divorced in 1968, and did not again formally remarry. Hence, only if a common-law marriage between these two existed at the intestate's death could Mrs. Brown fit within the statute's order of priority and prevail over the appellant Piel.
The facts heard ore tenus are uncontested. Following their divorce in 1968 Doris and Jim Brown continued living together, sharing the same home on Court Street in Montgomery. In 1970 the couple moved to a house on Damon Drive which was purchased in Doris' name under the FHA 235 program and which, in 1976, was sold by Doris as a divorced woman. Several witnesses testified however that many times in the years following the divorce Doris introduced Jim as her husband and she, in turn, was introduced as his wife. Further, in 1972 the two of them traveled to his father's funeral in Mississippi where his mother introduced them to friends and acquaintances as her son and his wife Doris. In that same year Jim organized a business subsequently called Diamond Enterprises, in which both he and Doris were stockholders and directors. Through this corporation a number of laundromats were operated. Doris was generally known to the managers of the laundromats as Jim's wife, and in 1976 when Jim was recuperating from a heart attack she handled the entire business for him.
In 1969, after the divorce, Doris had her checking account separated from that of Jim and from it made the house payment and food purchases while Jim paid the utility bills. Other testimony shows that from 1969 until Jim's death in 1977 Jim and Doris lived together and shared marital duties and relations and generally held themselves out to the public as man and wife.
In 1976 the couple moved from Damon Drive into two apartments, one at the Foxcroft Apartments on Calmar Drive, rented in the name of Diamond Enterprises, and the other a block away at Spanish Quarters Apartments, rented in Doris' name. The first month's rent at the latter apartment was paid by Jim Brown while Diamond Enterprises paid the rent at Foxcroft. All their furniture from Damon Drive was originally moved into Foxcroft, but some of it was subsequently moved into Spanish Quarters so that Jim could get to his equipment and tools. Their mail was received at both the Foxcroft Apartment and at P.O. Box 7022 which was also rented by Diamond Enterprises. Only the power bill on the Spanish Quarters apartment was received at that apartment.
During part of 1976 Jim's mother, Mrs. Maggie Brown, lived with them at the Foxcroft apartment until she was placed in a nursing home. She was visited there frequently by both Doris and Jim and on holidays *Page 93 
was taken home with Jim and Doris to their Foxcroft apartment. The administrator of the nursing home testified that Jim had introduced Doris as his wife and told her that since he was out of town often on business she should call his wife any time anything was needed for his mother. Also in 1976 a lot in Arrowhead was purchased with funds provided by Mrs. Maggie Brown with the stated intention of building a house big enough for the three of them to live together.
On July 8, 1976 Jim had a heart attack and was taken to the hospital. While Jim was recovering The Reverend Albert Newton visited and Jim was introduced to him as Doris' husband. Doris and Jim showed interest in his church and were subsequently placed on the church's mailing list as Mr. and Mrs. James W. Brown, 5727 Calmar Drive (Foxcroft Apartments). They also made a contribution to the church and received a contribution statement from the church addressed to Mr. and Mrs. James W. Brown.
There is evidence that in 1976 Doris filed an individual tax form listing herself as single, and the same was done by Jim in 1977. Further, the death certificate relative to Jim's death July 11, 1977 lists Jim as a single man and lists Doris as the informant though there was also testimony that Jim's eldest son, whom he had not seen in seven years, Jimmy Glenn Brown, was the actual informant.
The Alabama law pertaining to common-law marriages is less than semantically clear. There can be no doubt, however, that such a marital device exists in this state, not as an exception, but as a co-equal, alternate method of validating the connubial union of two people. The case of Campbell v.Gullatt, 43 Ala. 57 (1869) made it clear that a marriage is not to be declared invalid provided the requirements of the common law have been substantially complied with in the celebration of the marriage; i.e., "that a marriage good at the common law, is to be held a valid marriage in this State." A later case instructed that, "[t]he parties [to a common law marriage] stand to each other in the relation of husband and wife, having all the rights, and subject to all the duties, flowing from a marriage in strict conformity to the statute." Beggs v. State,55 Ala. 108 (1876). See also, White v. Hill, 176 Ala. 480,58 So. 444 (1912); Wall v. Williams, 11 Ala. 826 (1847). Citation of the numerous other cases on this point is needless for the issue in the present case turns not upon the legality of a common-law marriage but upon the existence of it based upon facts of this case.
Generally, to have a marriage good at common law there must be (1) capacity, (2) present agreement or consent to be husband and wife, and (3) consummation. See 52 Am.Jur.2d Marriage § 42 (1970).
Capacity of the deceased and appellee Doris Brown to enter a valid marriage is not disputed here. The second element, present agreement or consent to be husband and wife, is in issue, however. Admittedly, language contained in earlier cases would establish conflicting legal requirements. For example, when the issue of a common-law marriage was before the court inWhitworth v. Whitworth, 256 Ala. 296, 54 So.2d 575 (1951), the Court quoted language contained in a Florida case for a pertinent expression of the controlling principle:
 `"Neither cohabitation and repute nor circumstances, whose sole function is to show mutual consent of the parties, establishes a common-law marriage of itself. There must be words of present assent per verba de praesenti." In re Price's Estate, 127 Fla. 467, 176 So. 492, 493. (Emphasis supplied).'
That is the requirement insisted upon by the appellant here, although such a verbal assent in itself was not necessarily the form of assent required by the earlier opinion. Indeed, the present agreement element has been stated with words which have not included a verbal assent:
 [T]here must be mutual understanding to presently
enter into the marriage relationship, . . . there must be words of present assent. Humphrey v. Humphrey, 293 Ala. 118, 120, 300 So.2d 376, 377
(1974). *Page 94 
 [A] present agreement, a mutual understanding to presently enter into the marriage relationship, . . . Beck v. Beck, 286 Ala. 692, 697, 246 So.2d 420, 425
(1971).
 [A]n actual and mutual agreement to enter into a matrimonial relation, . . . Brown v. Brown, 276 Ala. 153, 155, 159 So.2d 855, 856 (1964).
 There must be words of present assent `per verba de praesenti' to lawfully contract marriage, . . . Goodman v. McMillan, 258 Ala. 125, 130, 61 So.2d 55, 59 (1952).
 [M]utual understanding between the parties to presently enter into the marriage relation, . . . Reynolds v. Scott, 257 Ala. 670, 672, 60 So.2d 690, 691 (1952).
 No particular words or formalities are required to constitute a common law marriage in the State of Alabama. . . . it is only necessary that there should be a mutual consent . . . . Smith v. O'Smith, 247 Ala. 213, 217, 23 So.2d 605, 609 (1945).
 Of course a valid common law marriage must rest upon mutual consent of the parties, a mutual agreement to be husband and wife, . . . Gilbreath v. Lewis, 242 Ala. 510, 513, 7 So.2d 485, 488 (1942).
 [O]nly necessary that there shall exist a mutual consent or agreement between the parties to be husband and wife, . . Tartt v. Negus, 127 Ala. 301, 28 So. 713 (1899).
Appellee insists that the law does not require direct proof of such an agreement, however, but that it can be inferred from the circumstances, i.e., from the cohabitation and reputation.Sloss-Sheffield Steel Iron Co. v. Watford, 245 Ala. 425,17 So.2d 166 (1944).
Certainly the law requires mutual understanding between two people to presently enter into the marriage relationship. However, proof of actual words of agreement or consent has never been required by this Court, rather, the test is one of intention in accord with the language of Beck v. Beck, supra:
"[n]o ceremony and no particular words are necessary to constitute a valid common-law marriage." That intention can be inferred from the circumstances. Watford, supra. And the court must determine that intention in each case according to its own particular facts and the circumstances of the parties, Beck v.Beck, supra; Goodman v. McMillan, supra.
In all cases then, the question is whether the evidence discloses facts manifesting a mutual intention by the parties to be man and wife. This manifestation must show presentintention, not an intention to marry in the future. Humphrey v.Humphrey, 293 Ala. 118, 300 So.2d 376 (1974); Turner v. Turner,251 Ala. 295, 37 So.2d 186 (1948). We believe the present case shows sufficient evidence from which the trial court could infer that there was indeed a present, mutual intention of the parties to enter into a marital relationship. When consummated, this intention created a common-law marriage which could only be ended by death or divorce. Huffmaster v. Huffmaster,279 Ala. 594, 188 So.2d 552 (1966).
The third element, consummation, has likewise been subject to different language used to convey the same thought. Mr. Justice Lawson in Beck v. Beck, supra, found it prudent to avoid what he described as "inundat[ion] in a sea of semantics" pertaining to this element.
None of our earlier cases has been ideally instructive on the manner in which a man and woman must live following formation of their marital intention. Most of the cases speak generally of "cohabitation." Herd v. Herd, 194 Ala. 613, 69 So. 885
(1915); Ashley v. State, 109 Ala. 48, 19 So. 917 (1896);Hawkins v. Hawkins, 142 Ala. 571, 38 So. 640 (1905). Some add "as man and wife" or " their mutual assumption openly of marital duties and obligation.'" White v. Hill, 176 Ala. 480,58 So. 444 (1912); Goodman v. McMillan, supra; Brown v. Brown,supra; Watford, supra. The better articulation of the requirement of consummation is that, following their mutual formation of intention the parties *Page 95 
must so live as to achieve public recognition of their status as husband and wife. Beck v. Beck, supra; Humphrey v. Humphrey,supra; Huffmaster v. Huffmaster, supra. The case Vinson v.Vinson, 260 Ala. 254, 69 So.2d 431 (1954) explains that this requirement rests upon reasons of public policy. There it is said that common-law marriage is based upon presumptive proofs, and that public recognition is the most persuasive of those proofs in demonstrating that marriage rather than mere concubinage has been intended by the parties. We believe cohabitation is a definite factor in gaining for the relationship its public recognition as a marriage but it need not be the only factor.
An excerpt from Maryland v. Baldwin, 112 U.S. 490,5 S.Ct. 278, 28 L.Ed. 822 (1884), cited with approval in Gilbreath v.Lewis, 242 Ala. 510, 7 So.2d 485 (1942) and Murphy v. Jacobs,249 Ala. 594, 32 So.2d 306 (1947), is pertinent:
 "But where no such ceremonies are required, and no record is made to attest the marriage, some public recognition of it is necessary as evidence of its existence. The protection of the parties and their children, and considerations of public policy, require this public recognition; and it may be made in any way which can be seen and known by men, such as living together as man and wife, treating each other and speaking of each other in the presence of third parties as being in that relation, and declaring the relation in documents executed by them while living together, such as deeds, wills, and other formal instruments. . . ."
Cohabitation is clearly present in this case. The couple lived together, shared household duties and expenses and engaged in numerous aspects of the day-to-day mutual existence of married persons. The evidence also shows that these facts were known to numerous persons.
Appellant asserts that the appellee, Doris Brown, failed to prove these factors by clear and convincing proof. We do not agree. It has been said that due to the serious nature of the marriage relationship, the courts will closely scrutinize a claim of common-law marriage and require clear and convincing proof thereof. Reynolds v. Scott, 257 Ala. 670, 60 So.2d 690
(1952); Goodman v. McMillan, 258 Ala. 125, 61 So.2d 55 (1952);Bishop v. Bishop, 57 Ala. App. 619, 330 So.2d 443 (1976). Applying that scrutiny to the facts of this case and keeping in mind the above discussion, we believe the trial court was correct in its finding that a common-law marriage existed.
Last, appellant argues that the trial court erred in allowing Mrs. Brown to testify over objection that she and the deceased were married. This argument is without merit. It is well-established in this state that a widow may testify to the fact of marriage between herself and her deceased husband.Cavin v. Cavin, 237 Ala. 185, 185 So. 741 (1939); Rogers v.McLeskey, 225 Ala. 148, 142 So. 526 (1932); Smith v. Smith,247 Ala. 213, 23 So.2d 605 (1945).
The decree of the trial court is due to be, and is, affirmed.
Affirmed.
TORBERT, C.J., and MADDOX, JONES and SHORES, JJ., concur.