BOWEN, Presiding Judge.
John Vernon Crawford, the appellant, was convicted of murder and was sentenced to life imprisonment. He raises two issues on this direct appeal from that conviction.
I.
The appellant alleges that his right to privileged spousal communications was violated when his alleged common law wife was forced to testify against him. He contends that the district attorney threatened her with imprisonment and with “never seeing her children again.” Appellant’s brief at 6.
The appellant’s alleged common law wife, Jeanine Jones Sasser, was competent to testify as a witness because she voluntarily elected to testify. See Ex parte Billingsley, 402 So.2d 1060, 1061 (Ala.1981). She was properly permitted to testify to the appellant’s statement to her in which he admitted committing the murder because there was no showing that she and the appellant were “married” at the time of that communication.
Ms. Sasser testified that Bruce Devane, an investigator for the district attorney’s office, told her that “if [she] didn’t tell him that he would send [her] to prison and [that she] would never get to see [her] daughter again.” R. 216. However, she also stated that her testimony was voluntary:
“Q. So why are you testifying today?
“A. Because I have thought a lot about it and it’s hard for somebody to tell somebody that and them keep it on their mind, and not be able to tell anybody. And it was driving me crazy. I had to do something. And if I had told anybody else they would have come back and said it.” R. 216.
Defense counsel explored Devane’s alleged threats on cross-examination of Ms. Sasser.
Ms. Sasser testified that approximately two weeks after the murder the appellant told her that he “didn’t do it.” R. 206. However, five weeks after the murder, the appellant told her that “he did it” and explained “how it [had] happened.” R. 207. In a hearing outside the presence of the jury, she testified that when the appellant made these statements to her she did not consider herself his wife, but that she did represent herself as the wife of the appellant at some point in time after these incriminating statements were made.
Ms. Sasser also testified that she had known the appellant “a year,” that their relationship was “[b]oyfriend and girlfriend,” that they had lived together and had had sexual relations, that she was “dating” him on October 6, 1991 (the date of the murder). R. 205. She further testified that at some point she and the appellant had shared household expenses and duties and that she had signed her name as “Jeanine Crawford.” She also stated that she and the appellant did not have any joint bank accounts, they did not own any property together, and that they had never filed a joint tax return.
Ruby Edwards, the appellant’s aunt, testified that Ms. Sasser started living with the appellant in November 1991, and that “in late November and all through December,” Sas-ser told “everybody that she got around” and that she and the appellant were married. R. 223-24.
Junior Bryant, the appellant’s employer, testified that the appellant and Ms. Sasser were living together in October 1991.
Dianna Crowson, a friend of the appellant, testified that on January 31 or February 1, 1992, Ms. Sasser “announced herself to me as Jeanine Crawford, and [said that] she had *747 been married, that she and Vernon had got married. And I said, ‘Really, when did all of this take place?’, because I had not seen Vernon and I had not heard nothing about it. And she told me they had got married and they had been living together for two or three months is exactly what the girl told me.” R. 230. Ms. Crowson testified that Sasser told her that she and the appellant started living together in November or December 1991.
Patricia Huckabee testified that on either January 31 or February 1, 1992, Ms. Sasser told her that “her and Vernon were married and that they had lived together and [had been] married for two or three months.” R. 232.
Jimmy Stiffle testified that he “reckoned]” that Jeanine Jones was known as the appellant’s “girlfriend.” R. 157.
Tony Adcock testified that the appellant was not married and that Jeanine Jones was his “girlfriend.” R. 167-68.
The trial judge summarized Ms. Sasser’s testimony regarding her “marriage” to the appellant:
“If I understand what she has said, she has said that at the time that the defendant made the statements to her that she testified about she said she did not consider herself the wife of the defendant. That’s what I understood that she said. At some time subsequent thereto she says she did sign [her name Jeanine Crawford] and did consider herself to be the wife of the defendant. But it was sometime subsequent to the alleged statements that were made to her.” R. 221.
The appellant testified in his own defense at trial. He denied committing the murder and testified that on the night of the crime he had had sexual intercourse with a woman, not Ms. Sasser, named “Mary.” He stated on direct examination that “at one point and time I considered her [Sasser] as my wife, you know, she lived with me for about a year.” R. 299.
“Insofar as any claim of disqualification or privilege is predicated upon a claimed relationship of husband and wife, the issue of the existence of such a relationship is to be decided by the trial judge and not by the jury.” C. Gamble, McElroy’s Alabama Evidence § 103.01(5) (4th ed. 1991), citing Jackson v. State, 53 Ala. 472 (1875).
In Eaton v. State, 423 So.2d 352, 354 (Ala.Cr.App.1982), this Court stated:
“Appellant urges that the testimony of witness Inez Wood constituted a violation of a' privileged communication between husband and wife. The thrust of this contention is that there existed a common law marriage relationship between the appellant and the witness, thus requiring that the witness be informed of her right not to testify. We agree that such is the state of the law; however, the evidence fails in great measure to support appellant’s contention of the existence of a common law marriage. In fact, the witness in her testimony denied that they ever held themselves out as man and wife, in spite of the fact that they ‘lived together’ at one time and she had two children by appellant. Obviously, the relationship did not ripen into a common law marriage. A common law marriage must rest on the mutual consent of the parties to it, a mutual agreement to be husband and wife, followed by cohabitation and living together as husband and wife. O’Dell v. O’Dell, 57 Ala.App. 185, 326 So.2d 747 (Ala.Civ.App.1976), and authorities cited therein.”
See also Rogers v. State, 417 So.2d 241, 248 (Ala.Cr.App.1982), and Thompson v. State, 56 Ala.App. 145, 320 So.2d 79 (1975), involving competency to testify.
“In Campbell’s Administrator v. Gullatt, 43 Ala. 57, 69 (1869), the Court held that ‘a marriage good at the common law, is ... a valid marriage in this State.’ A marriage at common law in Alabama requires the following:
“ ‘[T]here must be a present agreement or mutual understanding to enter into the marriage relationship, the parties must be legally capable of making the contract of marriage, and there must follow cohabitation as man and wife and a public recognition of that relationship.’
“Luther v.M&M Chemical Co., 475 So.2d 191, 193 (Ala.Civ.App.1985).”
Rickard v. Trousdale, 508 So.2d 260, 261 (Ala.1987).
*748 “Generally, to have a marriage good at common law there must be (1) capacity, (2) present agreement or consent to be husband and wife, and (3) consummation....
[[Image here]]
“Certainly the law requires mutual understanding between two people to presently enter into the marriage relationship .... That intention can be inferred from the circumstances. [Sloss-Sheffield Steel & Iron Co. v.J Watford, [245 Ala. 425, 17 So.2d 166 (1944) ]. And the court must determine that intention in each case according to its own particular facts and the circumstances of the parties....
“In all cases then, the question is whether the evidence discloses facts manifesting a mutual intention by the parties to be man and wife. This manifestation must show present intention, not an intention to marry in the future....
[[Image here]]
“... The better articulation of the requirement of consummation is that, following their mutual formation of intention the parties must so live as to achieve public recognition of their status as husband and wife....
[[Image here]]
“... [D]ue to the serious nature of the marriage relationship, the courts will closely scrutinize a claim of common-law marriage and require clear and convincing proof thereof.”
Piel v. Brown, 361 So.2d 90, 93-95 (Ala.1978).
The appellant had the burden of proving the existence of a common law marriage. “The burden of establishing the privilege rests with the ... party objecting to the disclosure of the communication.” Richards v. Lennox Indus., Inc., 574 So.2d 736, 739 (Ala.1990) (attorney-client privilege). “Whether a communication is privileged is ‘a matter solely within the province of the court to determine.’ ” Richards, 574 So.2d at 739. Cf. LaMonte v. Personnel Bd. of Jefferson County, 581 So.2d 866, 868 (Ala.Civ.App.1991) (“the burden is on the party seeking to assert the work product privilege”).
We are aware that the Alabama Supreme Court has indicated that the spousal privilege may apply if the parties are married at the time the spouse is offered as a witness, even if they were not married at time of the crime. See Elmore v. State, 140 Ala. 184, 37 So. 156 (1904). In view of Ms. Sasser’s testimony that she was not “still dating” the appellant at the time of the trial, R. 246, Elmore has no application.
“Generally, rulings on the admissibility of evidence are within the discretion of the trial judge and will not be disturbed absent an abuse of that discretion.” Preferred Risk Mut. Ins. Co. v. Ryan, 589 So.2d 165, 166 (Ala.1991). See also Finley v. State, 606 So.2d 198, 202 (Ala.Cr.App.1992). The trial judge acted within his discretion in his implicitly finding that there was no common law marriage at the time of the inculpatory communication.
II.
The appellant’s argument that his motion for judgment of acquittal was due to have been granted is without legal or factual merit. The appellant admitted killing Ollie R. Bush to both his girlfriend, Ms. Jones, and his friend, Allen Richardson. Blood and hair consistent with the victim’s were discovered on the appellant’s tennis shoes. The evidence against the appellant was substantial.
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.