On May 19, 1994, Douglas C. Martinson II, as administratorad colligendum of the estate of Lucy Gabriel Parks, filed a complaint in the Madison County Circuit Court, alleging that Lucy Gabriel Parks had married Clarence Parks on December 25, 1993, and that she had died on February 14, 1994. Martinson alleged that the marriage between Lucy and Clarence was invalid because, he claimed, the parties did not have a marriage license at the time the ceremony was performed, and that no marriage ceremony had been performed after the parties obtained a marriage license. Martinson also alleged that Lucy had been incapable of caring for herself at the time of the alleged marriage and that Clarence had used improper pressure to persuade Lucy to marry him. Martinson requested the trial court to hold that the December 25, 1993, marriage between Lucy and Clarence was invalid and/or to *Page 1387 
annul the marriage. On June 1, 1994, Clarence answered, admitting that no marriage license had been obtained before the marriage ceremony and that a marriage license had been obtained only after the marriage ceremony. He denied that the marriage was invalid.
On January 11, 1996, Clarence filed a motion for summary judgment, along with deposition testimony excerpts. On February 16, 1996, Martinson filed affidavits from Lucy's niece, brother-in-law, brother, and sister. On February 20, 1996, Martinson filed an opposition to Clarence's motion for summary judgment, along with a narrative statement of the facts, and deposition testimony excerpts. On March 6, 1996, the trial court entered an order denying the motion for summary judgment, holding that there existed genuine issues of material fact and that Clarence was not entitled to a judgment as a matter of law.
Following an ore tenus proceeding on June 18, 1996, the trial court entered a judgment on June 21, 1996, stating, in pertinent part:
 "Upon consideration of all the evidence presented in this case, including live testimony and testimony presented by deposition, as well as all exhibits properly admitted, and based further upon the pleadings and arguments of counsel, this Court is of the opinion that [a] final judgment should be rendered in favor of [Martinson] and against [Clarence] consistent with the findings of fact and conclusions of law as follows:
"Findings of Fact
 "1. Due to health problems involving breast cancer, [Lucy] Gabriel Parks ('Decedent') took early retirement from the Toledo (Ohio) School System, and made preparations to return to the place of her birth, Huntsville, Alabama.
 "2. Prior to coming to Huntsville, Decedent made preparations to build a house on the family estate. She sold her home in Toledo, Ohio, and placed the money in an account in Huntsville. Upon completion, the house was paid for in-full from the funds of Decedent.
 "3. The Decedent moved to Huntsville in June of 1993, and moved into her home the first weekend of September 1993. Up until the house was completed, Decedent resided with Mr. [Laverne] Reed and his wife, Maggie, Decedent's oldest sister.
 "4. Commencing in July of 1993, Decedent began having difficulties with her legs. This soon resulted in her not being able to drive because of the severe pain in her right leg. By September, Decedent could not walk without a walker, and a potty chair was necessary beside her bed. She could not walk a long distance without the pain becoming too severe. It was soon determined that the pain was caused by a spread of the cancer to other parts of her body including her legs.
 "5. The Decedent also developed a severe cough, which was later diagnosed as congestive heart failure and fluid collection in her lungs.
 "6. The Decedent could not be left alone at her home because of the pain and [her] need of assistance. Someone had to be with her at all times. Her meals had to be prepared, and assistance was needed in getting dressed.
 "7. Tracy Boone ('Tracy'), Decedent's niece, moved in with her in September of 1993. While Tracy was at Alabama A M [University] taking courses in the evenings, Maggie and Laverne Reed were at the home with Decedent. Gary Scruggs also stayed with Decedent some evenings and weekends. A friend, Martha McCrary, also stayed with Decedent, and was paid by Decedent.
 "8. By October of 1993, Decedent was completely bedridden, and was forced to use a bed pan. . . .
 "9. The Decedent had frequent visits with Dr. [Lizabeth M.] Harden, who later recommended her to Dr. Marshall Schreeder, who is a cancer specialist.
 "10. Prior to November 30, 1993, Decedent had been prescribed Demoral for pain. . . . On November 30, 1993, Dr. Harden prescribed morphine sulfate, . . . because Demoral was no longer effective. . . .
 "11. Dr. Marshall Schreeder, Decedent's oncologist, changed this morphine *Page 1388 
prescription during her visit on December 3, 1993, [to MS Contin, a sustained-release morphine]. . . . Dr. Schreeder also prescribed [Lorcet Plus] for 'breakthrough pain.'. . . .
 "12. Dr. Schreeder had first seen Decedent in September and indicated that her physical condition had 'most definitely' degenerated between September and December. . . . Dr. Schreeder also indicated that Decedent's pain treatment regime was of the highest medical classification known as [Class] 3. . . . Dr. Schreeder indicated that these Class 3 pain medications initially blunt one's mental ability, with such mental deterioration resolving itself over a number of weeks. . . . Dr. Harden also confirmed that morphine impairs mental and cognitive ability through sedation, drowsiness, disorientation, and sometimes hallucinations. . . . Although Dr. Harden did not witness these side effects in Decedent . . ., she clearly testified that Decedent's medication impaired her mental and cognitive ability in December of 1993. . . .
 "13. Dr. Schreeder indicated that Decedent's physical condition continued to deteriorate from December 3rd to December 29th when he hospitalized her. . . .
 "14. [Clarence] was a 'friend' of Decedent's from Toledo, Ohio. [Clarence] first became acquainted with Decedent as a pastor, but his interest soon changed. Clarence had proposed marriage to decedent on numerous occasions in the past, commencing shortly after the death of Decedent's husband in late 1987. The Court notes that at the time of the original proposals [Clarence] was still married. These proposals continued for years, throughout Decedent's breast cancer and treatment for the cancer. The Decedent had consistently refused his proposals.
 "15. [Clarence] called Decedent daily during the fall and winter of 1993, and made numerous uninvited visits to Huntsville. [Clarence] relentlessly harassed the Decedent to marry, even though he knew of her condition. She consistently told [Clarence] and her family that she did not want to marry [Clarence].
 "16. The Decedent's condition deteriorated rapidly during the late fall and winter of 1993. By Christmas, Decedent was prescribed enormous amounts of pain medication and had lost approximately 1/3 of her total body weight. The family of Decedent (and not [Clarence]) provided around the clock care for Decedent.
 "17. The Court finds that [Clarence] had given sworn testimony by way of a verified complaint in a Will Contest Proceeding alleging that Decedent was 'infirm, weak and easily influenced due to her frail and sick condition.'. . . .
 "18. Within minutes of arriving in Huntsville on the evening of Christmas Eve, [Clarence] approached Laverne Reed about him and Decedent getting married on Christmas Day.
 "19. Mr. Reed asked Decedent about the proposed marriage, and Decedent told Mr. Reed that she was tired of [Clarence] worrying her about marriage. She requested no pictures at the ceremony, and for her last name to remain Gabriel.
 "20. A ceremony was performed at approximately [1:00] p.m. on Christmas Day, 1993. However, no marriage license was obtained prior to the [ceremony]. In fact, the minister conducting the ceremony was unaware that no license for the marriage existed until the ceremony was concluded. The minister informed [Clarence] at that time that no valid marriage had taken place without a license. The minister also stated that if he had been presented all of the relevant facts prior to the ceremony that he would not have attempted to marry the couple.
 "21. The Decedent was in no condition to be married on Christmas Day. The Court finds that Decedent was not mentally capable of consenting to marriage nor was she capable of forming a meaningful intention to marry. Although [Clarence] stated that he did not realize that Decedent was so sick, this Court finds that [Clarence] clearly knew of Decedent's condition.
 "22. During the week following Christmas, the Decedent was taken to the doctor twice, and on December 29, she was admitted *Page 1389 
to the hospital for surgery. Decedent remained in the hospital for over one week. Knowing of Decedent's condition, [Clarence] left her at the hospital to go to Birmingham to visit relatives.
 "23. On Monday, January 3, 1994, [Clarence] returned to Huntsville from Birmingham, and then left again for Ohio. In fact, [Clarence] had made no arrangements to move from Ohio to Huntsville prior to the wedding.
 "24. [Clarence] did not return to Huntsville until late January 1994. Before this time, a member of the family was with Decedent at all times. After [Clarence] returned, a member of the family continued to stay with Decedent day and night to monitor her condition. In fact, Decedent requested of the family that she not be left alone with [Clarence].
 "25. The Decedent passed away on February 14, 1994. [Clarence] stayed in Decedent's house only a few days. They slept in separate bedrooms. The Decedent was incapable of any sexual intercourse. The pain and pressure on Decedent's legs would have been unbearable.
 "26. [Clarence] never took on the responsibilities of a husband. Further, this Court finds that [Clarence] never consummated this marriage by so living as husband and wife so as to achieve public recognition in that status.
"Conclusions of Law
 "27. [Section 30-1-9, Ala. Code 1975,] regarding marriage without a license is unambiguous:
 " 'No marriage shall be solemnized without a license.'
 "The Court finds that no statutory marriage ever existed between Decedent and [Clarence].
 "28. The Court notes, however, that a failed statutory marriage followed by the requisite elements of a common law marriage may result in a valid marriage. These elements are ' "[1)] capacity; [2)] present, mutual agreement to permanently enter the marriage relationship to the exclusion of all other relationships; and [3)] public recognition of the relationship as a marriage and public assumption of marital duties and cohabitation [commonly known as consummation]." ' . . . Butler v. Coonrod, [671 So.2d 750, 751 (Ala.Civ.App. 1995) (quoting], Boswell v. Boswell, 497 So.2d 479, 480
(Ala. 1986)[)]; see also Lofton v. Estate of Weaver, 611 So.2d 335 (Ala. 1992); and Piel v. Brown, 361 So.2d 90 (Ala. 1978).
 "29. The Court finds based upon the facts and circumstances of this case, at least two of the requisite elements of a common law marriage are absent. First, based upon the evidence presented, the Court finds that Decedent lacked the mental capacity to marry on or after December 25th, 1993. Further, separately and severally, the Court finds that the relationship between Decedent and [Clarence] was not consummated as required by Alabama law.
 "It is therefore ORDERED, ADJUDGED, and DECREED as follows:
 "1. That [Martinson] is entitled to [a] judgment on the complaint as amended;
 "2. That there is a determination that the marriage, if any, of Lucy Gabriel Parks and [Clarence] is void ab initio;
 "3. That the marriage, if any, as was documented by the marriage certificate and marriage license issued in this matter, is hereby annulled and found to be void and of no force and effect."
Clarence appeals, raising two issues: (1) whether the trial court erred in finding that he and Lucy did not have a valid statutory marriage, and (2) whether the trial court erred in finding that he and Lucy did not have a common law marriage.
When a trial court's findings regarding the validity of a marriage are based upon ore tenus evidence, this court will not reverse those findings unless they are palpably wrong, without supporting evidence, or manifestly unjust. Howard v. Pike,290 Ala. 213, 275 So.2d 645 (1973). Although there is a presumption in favor of a trial court's findings of fact where the evidence was presented ore tenus, such a presumption does not apply where the trial court has misapplied the law to those facts.DeWitt v. Stevens, 598 So.2d 849 (Ala. 1992). *Page 1390 
 I. Statutory Marriage
Section 30-1-9, Ala. Code 1975, states, in pertinent part, "No marriage shall be solemnized without a license." Our Supreme Court has held that a marriage ceremony performed without a license does not constitute a valid statutory marriage.Herd v. Herd, 194 Ala. 613, 69 So. 885 (1915); Ashley v. State,109 Ala. 48, 19 So. 917 (1895). Lucy and Clarence went through a marriage ceremony on December 25, 1993; however, a marriage license was not obtained until December 29, 1993. Therefore, we conclude that the trial court did not misapply the law to the facts, and that the trial court's determination that the marriage between Lucy and Clarence was not a valid statutory marriage was not error.
 II. Common Law Marriage
The elements of a valid common law marriage are: "(1) capacity; (2) present agreement or mutual consent to enter into the marriage relationship, permanent and exclusive of all others; (3) public recognition of the existence of the marriage; and (4) cohabitation or mutual assumption openly of marital duties and obligations." Adams v. Boan, 559 So.2d 1084,1086 (Ala. 1990) (citations omitted).
The trial court heard conflicting testimony regarding Lucy's mental capacity, her ability to consent to a marriage to Clarence, and her ability to consummate a marriage. "It is the duty of the trial court to resolve conflicting evidence, and its findings are conclusive if there is any evidence to support them." Varner v. Varner, 662 So.2d 273, 277
(Ala.Civ.App. 1994).
The record reveals that Lucy's breast cancer spread to the bones in her right hip and leg and in her sacral spine (lower back). The spread of the cancer made Lucy unable to walk and caused severe pain and weight loss. Lucy's treating physicians testified that the pain medications they had prescribed for Lucy affected her cognitive ability. Dr. Marshall Schreeder, Lucy's oncologist, specifically testified by deposition that the pain medications that he had prescribed for Lucy on December 10, 1993, have the tendency to "blunt one's mental ability." He testified that a tolerance for the medications usually develops within a matter of "a few weeks." Dr. Lizabeth M. Harden, Lucy Gabriel Harden's internist, testified by deposition that morphine impairs cognitive ability and that Lucy was so impaired in December 1993.
Lucy's relatives each testified that in December 1993 she was in intense pain; that she was not able to walk, even to the bathroom; that when they tried to move or turn her, she complained of pain in her legs and hips; that when she was at home one of them stayed with her at all times; and that she had asked them not to leave her alone with Clarence.
Based upon a careful review of the record, we conclude that the trial court's findings that Lucy lacked the capacity to consent to marriage and that Lucy and Clarence had not cohabited were not palpably wrong, without supporting evidence, or manifestly unjust. Therefore, the trial court did not err in holding that Lucy and Clarence did not have a common law marriage.
The judgment of the trial court is due to be affirmed.
AFFIRMED.
YATES, MONROE, and CRAWLEY, JJ., concur.