874 So.2d 562 (2003)
Richard Terrell BUFORD, Jr.
v.
Linda Ellen Frierson BUFORD.
2020163.
Court of Civil Appeals of Alabama.
May 9, 2003.
*563 John D. Norris, Montgomery, for appellant.
Slade Watson, Mobile, for appellee.
*564 THOMPSON, Judge.
On November 8, 2000, Linda Ellen Frierson Buford sued Richard Terrell Buford, Jr. ("Terry"), seeking a divorce to dissolve their common-law marriage. On January 2 and 25, 2002, the trial court held a preliminary hearing at which, among other things, both parties testified as to the facts surrounding the alleged common-law marriage. On February 1, 2002, the trial court entered an order finding that a common-law marriage existed between Linda and Terry. At Terry's request, the trial court later made its order finding the existence of a common-law marriage final in accordance with Rule 54(b), Ala. R. Civ. P. Terry timely appealed.
The ore tenus rule provides our standard of review for this determination that a common-law marriage existed. Downs v. Newman, 500 So.2d 1062 (Ala.1986). We assume that the trial court's findings are correct, and its judgment based upon those findings will not be reversed unless it is plainly and palpably wrong, without any supporting evidence, or manifestly unjust. Downs v. Newman, supra. Courts of this state closely scrutinize claims of a common-law marriage and require clear and convincing proof of such a marriage. Walton v. Walton, 409 So.2d 858 (Ala.Civ.App.1982).
Linda testified that she met Terry through his uncle, who was involved with her father in breeding and racing greyhounds. Linda testified that she began having sexual relations with Terry when she was 18 years old and Terry was 19 years old. Linda testified that she began living with Terry's mother in November 1984, shortly after she became pregnant with his child. Linda testified that Terry lived next door to her in his grandmother's house. She testified that the parties' only child, Richard Edward Buford, was born on July 22, 1985.
Linda testified that in November 1984 she began using the last name Buford. According to Linda, after the birth of their son, she and Terry lived together in a residence attached to his grandmother's house; she testified that they eventually moved into an apartment together in Mobile. Linda testified that Terry gave her his grandmother's antique ring and a "wedding set" in November 1984 and that he gave her a "wedding ring" on December 25, 1984. Linda testified that Terry gave her the ring in front of his entire family. Linda testified that Terry introduced her as his wife to their family, friends, and their parents.
Linda testified that the couple incurred joint debts for automobiles, furniture, and charge accounts and that she and Terry opened a joint bank account in November 1984. Linda testified that Terry also added her to his bank account as Linda Buford. According to Linda, the parties moved several times, each time continuing to cohabitate; they lived in Alabama, New Hampshire, and Massachusetts.
At the hearing, Linda testified that she was listed on both business and personal bank accounts with Terry and produced the following bank-account statements: an October 7, 1985, bank statement from Central Bank in Mobile for an account in the name of "Terry Buford or Linda Buford"; a March 18, 1985, bank statement from First National Bank of Mobile for an account in the name of "Terry Buford or Linda Buford"; a February 8, 1988, Bank of Mississippi bank statement for an account in the name of "Terry Buford or Linda E. Buford"; a June 15, 1987, bank statement from Southeast Bank in Panama City, Florida, for an account in the name of "R.T. Buford, Jr. or Linda E. Buford"; and an August 31, 1990, bank statement from Bay Bank in Burlington, Massachusetts, *565 for an account in the name of "Richard J. [sic] Buford and Linda Buford." Linda testified that she and Terry filed joint income-tax returns; she testified that she could not produce those tax records because neither the Internal Revenue Service nor the company that had prepared their tax returns kept records that were over ten years old. In 1991, Linda filed an individual federal tax return, as "head of household."
Sally Ferrera, Linda's mother, testified that she did not know the couple had not had a ceremonial wedding until the day of the hearing. Ferrera testified that Linda led her to believe that the couple were married at a ceremony; Linda testified that she deceived her mother because Ferrera disapproved of premarital sexual relations and cohabitation. Ferrera testified that Terry did not lie to her about the wedding. However, Ferrera testified that she heard Terry refer to Linda as "his wife."
Terry testified that he did not consider his relationship with Linda to be a common-law marriage, but that he considered her to be his girlfriend. Terry testified that both he and Linda dated other people during their relationship. Terry stated that he was aware that Linda used his last name, "Buford," but did not remember living with her at an apartment complex in Mobile. Further, Terry testified that he and Linda did not live together after the birth of their son; he confirmed that Linda lived with his mother and he lived with his grandmother but that the couple were not cohabitants. According to Terry, the antique ring he gave Linda was not intended to be a wedding ring and he testified that he does not remember giving her a wedding ring at Christmas in 1984.
During his testimony, Terry said that he and Linda had joint bank accounts because they were business partners in a greyhound kennel and that he had placed her name on the account as a "business surety"; Terry did not testify as to why he had added her as Linda Buford. Terry denied that he and Linda had filed joint tax returns.
Terry testified that he married his current wife, Pat Lorenz, on November 12, 1992, in Pulaski, Arkansas. Terry testified that he and Pat have an adopted son who is six years old. Pat testified that she had known and communicated with Linda about Terry's child support for Linda and Terry's son for the past 10 years. Linda claims that she told Pat that she and Terry were married; Pat testified that during the 10 years they had known each other, Linda did not mention that she and Terry were married.
Terry's uncle, Ed Adams, and Terry's mother, Emily Mott, testified that they considered Linda to be Terry's girlfriend. Adams testified that Terry and Linda were cohabitating when they moved to New Hampshire in 1988 and that he lived with them. Mott testified that when Terry and Linda resided with her in Mobile they were not cohabitating or sexually active because Linda resided with her and Terry resided with the grandmother; Mott testified that Terry and Linda were not allowed to cohabitate under her roof. Mott testified that she did not remember Terry's giving Linda a wedding ring for Christmas in 1984. Linda testified that Mott called her her "daughter-in-law" and that she often gave her advice about how to be a good "wife."
Mott stated during testimony that she had personal knowledge that Terry dated women other than Linda during the time Linda was claiming they were married; she identified those women as Janelle, Julie, and Jolene. Linda refuted that testimony; she testified that Jolene was Terry's high-school girlfriend whom he had *566 dated before he met her; Linda testified that Terry dated Janelle after they had separated and that she did not know Julie but thought she might be a young woman who worked at the dog track. Terry and Mott testified that Linda had had several boyfriends during the time of the alleged common-law marriage. Linda testified that she considered herself married to Terry and that she did not date other men until the parties separated in late 1991 or early 1992; Linda admitted that she lived with one of her boyfriends for seven months in 1997, five years after Terry married Pat. Linda alleged that she continued to have sexual relations with Terry after he was married to Pat.
On appeal, Terry argues that the trial court erred in finding that a common-law marriage existed between the parties because he did not agree to enter into a marital relationship with Linda and there was no public recognition of the relationship as a marriage.
"[W]hile no ceremony or particular words are necessary, there are common elements which must be present, either explicitly expressed or implicitly inferred from the circumstances, in order for a common-law marriage to exist. Those elements are: 1) capacity; 2) present, mutual agreement to permanently enter the marriage relationship to the exclusion of all other relationships; and 3) public recognition of the relationship as a marriage and public assumption of marital duties and cohabitation."
Boswell v. Boswell, 497 So.2d 479, 480 (Ala.1986)(citing Etheridge v. Yeager, 465 So.2d 378 (Ala.1985)).
This court has addressed the issue of mutual agreement to enter permanently the marital relationship and has held that "[n]o specific words of assent are required" and that "present intention is inferred from cohabitation and public recognition." Waller v. Waller, 567 So.2d 869, 869-870 (Ala.Civ.App.1990). The manner in which a couple must cohabit in order to gain public recognition is stated in Maryland v. Baldwin, 112 U.S. 490, 5 S.Ct. 278, 28 L.Ed. 822 (1884):
"But where no such ceremonies are required, and no record is made to attest to the marriage, some public recognition of it is necessary as evidence of its existence. The protection of the parties and their children, and considerations of public policy require this public recognition; and it may be made in any way which can be seen and known by men, such as living together as man and wife, treating each other and speaking of each other in the presence of third parties as being in that relation, and declaring the relation in documents executed by them whilst living together, such as deeds, wills, and other formal instruments."
112 U.S. at 495, 5 S.Ct. 278 (cited with approval by the Alabama Supreme Court in Piel v. Brown, 361 So.2d 90 (Ala.1978), and Downs v. Newman, 500 So.2d 1062 (Ala.1986)).
There must also be clear and convincing evidence that the parties "live[d] as to achieve public recognition of their status as husband and wife" or, cohabitated. Piel v. Brown, 361 So.2d at 95. While living together and conducting a sexual relationship are indicative of achieving marital status, those are not absolutely necessary to a determination of cohabitation. Other evidence to be considered is whether
"the parties considered themselves married, shared household duties and expenses, maintained joint accounts, filed joint tax returns, used the same surname, referred to or introduced each other as a spouse, listed themselves as `married' on various documents, or reared children together." *567 John B. Crawley, Is the Honeymoon Over For Common-Law Marriage: A Consideration of the Continued Viability of the Common-Law Marriage Doctrine, 29 Cumberland L.Rev. 399, 409-410 (1998-1999)(footnotes omitted).
It is undisputed that Terry and Linda had a son together, and he bore Terry's last name. Linda testified that she used Terry's last name from November 1984 until sometime in 1991 or 1992; that testimony was supported by several bank-account statements and her Social Security card. Linda, Terry, and Terry's uncle testified that Linda and Terry cohabitated. Linda testified that Terry gave her a "wedding ring," which she says she wore until the parties separated. Linda testified that Terry introduced her to their family and friends as "his wife" and that Mott referred to her as her "daughter-in-law."
While Terry and his family might have considered Linda to be a girlfriend, Terry and Linda's outward signstheir child and the facts that they cohabitated and had joint bank accountssatisfy enough of the "aforementioned criteria generally indicative of public recognition" to determine that Terry assented to the marriage. Downs v. Newman, 500 So.2d at 1064. The trial court weighed the disputed evidence and determined that Terry and Linda met the requisite elements of a common-law marriage. Given the facts and the standard of review, we cannot say that the trial court's decision was plainly and palpably wrong. Skipworth v. Skipworth, 360 So.2d 975 (Ala.1978).
Terry also argues that Linda should be estopped from asserting the existence of a common-law marriage because Linda did not file for divorce until eight years after his ceremonial marriage to his current wife. Terry made no argument regarding estoppel at the hearing or in a postjudgment motion. This court may not consider an issue raised for the first time on appeal. Somers v. McCoy, 777 So.2d 141 (Ala.Civ.App.2000)(citing Andrews v. Merritt Oil Co., 612 So.2d 409 (Ala.1992)); S.W.M. v. D.W.M., 723 So.2d 1271 (Ala.Civ.App.1998). This court's review is restricted to those arguments considered by the trial court. Somers v. McCoy, supra (citing Lyons v. Porter, 539 So.2d 298 (Ala.Civ.App.1988)). Further, Terry's brief on appeal does not cite any statutory authority or caselaw in support of his argument. It is not the function of this court to create arguments or to perform legal research for an appellant. Carr v. Howard, 777 So.2d 738 (Ala.Civ.App.2000)(citing McLemore v. Fleming, 604 So.2d 353 (Ala.1992)). Therefore, we decline to address that argument.
AFFIRMED.
YATES, P.J., and PITTMAN, J., concur.
CRAWLEY and MURDOCK, JJ., dissent.
MURDOCK, Judge, dissenting.
I respectfully dissent for two reasons. First, the plaintiff filed a complaint seeking a divorce. The trial court's finding as to the threshold factual issue whether the parties were married[1] is not an order as to a separate claim that may be properly certified as a final judgment pursuant to Rule 54(b), Ala. R. Civ. P. See Precision American Corp. v. Leasing Serv. Corp., 505 So.2d 380 (Ala.1987); Williams v. Fogarty, 727 So.2d 831 (Ala.Civ.App.1999).
Second, even if the trial court's order properly could have been the subject of a Rule 54(b) certification, I am not persuaded *568 that the certification in the present case was adequate. The trial court did not make any reference to Rule 54(b) in its order and did not make "an express determination that there is no just reason for delay" as required by the rule. See Schneider Nat'l Carriers, Inc. v. Tinney, 776 So.2d 753 (Ala.2000); Moore v. Moore, 666 So.2d 5 (Ala.Civ.App.1995); see also Marlow v. Waters, 858 So.2d 980 (Ala.Civ.App.2003).
I therefore must conclude that this Court is without jurisdiction of this matter because it is an attempted appeal from a nonfinal, interlocutory order, not from a final judgment. The appeal therefore should be dismissed.
CRAWLEY, J., concurs.
NOTES
[1] The court characterizes this finding as a "partial finding."